DEZSO SULYOK, Respondent, v. PENZINTEZETI KOZPONT BUDAPEST, Appellant.

First Department, March 11, 1952.

*Paul L. Ross* of counsel (*Martin Popper* with him on the brief; *Wolf, Popper, Ross & Wolf,* attorneys), for appellant.

*Laszlo Kormendi* of counsel (*Graustein & Kormendi,* attorneys), for respondent.

VAN VOORHIS, J. This is an appeal from a judgment in favor of plaintiff against defendant in the sum of $76,386.68, after a jury trial. Jurisdiction was obtained by the attachment of funds of defendant in New York City.

The cause of action is to recover damages for the breach and repudiation of a contract of employment for a term of years with pension rights. The charter and by-laws of the defendant corporation (referred to as " P.K.") provide that its president shall be appointed by the Head of the State for a fixed term of five years. Its by-laws provide that the president shall receive such compensation or other benefits as may be determined or approved by the Minister of Finance. The plaintiff was appointed president of defendant corporation in accordance with the charter and by-laws for a term from September 1, 1945, to August 31, 1950. Plaintiff accepted the appointment, entered upon his duties, continued to serve defendant as its president and performed his required duties until his discharge from employment. It has been found that plaintiff was discharged without cause on August 9, 1947, and that defendant has repudiated all of its obligations under the employment contract.

Plaintiff was born in Hungary, was trained as a lawyer and practiced law. After World War II, he resumed his law practice and in April, 1945, was elected Mayor of his native city of Papa. He was elected to the Hungarian Parliament. He apparently could retain his seat in Parliament during his tenure as president of defendant company.

P.K. was incorporated under a special charter passed by the Hungarian Parliament in 1916 as a " cooperative society ". This was a type of enterprise known to Hungarian law. The by-laws of P.K. specifically provide that it is subject to the provisions of the Code of Commerce applicable to co-operative societies. P.K. had A shares of stock and B shares of stock; the B shares were held by the Hungarian Government and represented the majority of its capital; the A shares were held by banks and other financial institutions. P.K. had a wide range of functions extending from a general promotion of the interests of banking institutions in Hungary, to a supervisory and lending capacity in relation to such banks. It also could " enter into any kind of legal transaction."

The Minister of Finance, operating under section 38 of defendant's by-laws, determined the " compensation and other benefits " to be payable to plaintiff at a stated annual salary and a pension or retirement allowance commencing upon the termination of his employment.

During June, 1947, plaintiff made a speech in the Hungarian Parliament attacking the incumbent regime, asserting that it had contributed to the oppressive conditions in Hungary generated by Soviet occupation. Thereafter, on August 9, 1947, a decree was signed by the President of Hungary discharging plaintiff from his office with defendant. He told plaintiff that he would have to bear the consequences of his conduct " because the Russians do not joke in such matters." Three days later, another decree was signed appointing someone else as president of defendant corporation. After midnight of August 15, 1947, plaintiff and his wife escaped across the border into the American zone of Austria, disguised as peasants. In October, 1947, a decree was issued depriving plaintiff of his Hungarian citizenship. He never returned, but came to the United States at some time before February 1, 1949. He lives in New Brunswick, New Jersey.

The court charged the jury that, as a matter of law, there was a valid employment contract between plaintiff and defendant for a term of five years, which also conferred pension rights. The court submitted to the jury as an issue of fact whether plaintiff left defendant's employ voluntarily, or was discharged from his position. As to damages, the court charged that the jury, if it found for plaintiff, should find two separate amounts: (1) damages resulting from breach of the covenant for a five-year term of employment, and (2) damages for pension rights thereby destroyed. The jury found $13,693 for damages resulting from loss of salary during the balance of plaintiff's term of employment, and that plaintiff is entitled to $4,339, payable annually, by way of pension rights based on a finding that plaintiff was entitled to a pension amounting to 60% of his salary. Whether the Hungarian law permitted a lump-sum recovery representing the present actuarial value of future pension installments, was submitted to the jury as a question of fact. The jury decided that it did not permit such a recovery. After the verdict, the Trial Justice held that he should have decided the Hungarian law under subdivision B of section 344-a of the Civil Practice Act instead of submitting that question to the jury. The court thereupon awarded a lump sum under Hungarian law for the pension, viz., $56,988, based on a life expectancy of nineteen years with a stipulated discount factor of 4%, and computed on an annual amount of 60% of his salary. Judgment was entered for a total sum of $70,681, plus interest and costs.

Upon this appeal, defendant raises various questions, some of which do not require discussion. Plaintiff was properly found to have been duly appointed as president of defendant corporation. The undisputed evidence is that he held a regular executive position, the duties of which required him to make the final decision for defendant on corporate loans and questions of personnel. The auditors of the bank reported to him personally, he took part in daily staff meetings and was forbidden to hold any position with another corporation. Under the by-laws, his salary was paid by defendant, and his pension was to have been debited to its business account. Defendant's expert witness upon Hungarian law, one Emeric Rittinger, was present at the corporate meeting of defendant at which plaintiff's appointment as president was recorded and approved, but made no objection to it then. The fact that the by-laws of defendant provide that the compensation and other benefits payable to the president of the corporation should be determined by the Hungarian Minister of Finance, does not militate against the existence of the relationship of employer and employee under the Hungarian law regulating co-operative corporations. Several other officers of defendant were appointed in the same manner, and accorded pension rights. Plaintiff's expert on Hungarian law testified that the by-law empowering the Minister of Finance to fix plaintiff's compensation and '' other benefits '', authorized the establishment of pension rights as part of the contract of employment. The evidence is ample to sustain the trial court's finding that plaintiff's grant of pension rights was valid under the law of Hungary.

The case of *Morgan* v. *Tennessee Vall. Authority* (115 F. 2d 990), is not in point. Defendant P. K. was not just '' an administrative arm of the executive department '' of the Government, like the T.V.A. The declaration in the Hungarian laws of 1948, '' Relating to National Enterprises,'' is significant. This declaration states, concerning such enterprises: '' The General Manager [Manager] shall be appointed by the Government upon the proposal of the competent Minister. *The appointment creates a legal relationship of employment subject to private law between the national enterprise and the General Manager* [Manager] ; in the sphere of this legal relationship of employment the rights of the employer shall be exercised by the competent Minister ''. (Italics supplied.) Although this law took effect after plaintiff's employment, and used the terminology of manager instead of president, the idiom of thought was the same. The corporation continued to be conceived as the employer and not the Government.

Neither is appellant's point well founded that the removal of plaintiff by the Head of the Hungarian State was not a discharge of plaintiff as president of defendant. The same power which appointed him could have removed him, if plaintiff had violated his duties to the corporation. If the Head of State removed him wrongfully, the corporation must take the consequences. Since the corporate charter and by-laws vested the right of appointment in the Head of State, the power of removal was also in the Head of State, rather than in the other machinery of the corporation. A successor to plaintiff was appointed by the Head of State three days after plaintiff's removal, who was recognized as its president by P. K.

The most difficult questions presented by this appeal relate to whether plaintiff is entitled to recover damages for loss of salary during the balance of his term of employment, notwithstanding that pension rights were accorded to him in event of his being discharged before the end of his term; whether the decrees of the Hungarian Government in 1948 reducing pensions in amount and prohibiting their payment to persons who had departed from Hungary for more than three months, have impaired or destroyed plaintiff's pension rights; whether plaintiff can recover a lump sum in the amount of the present actuarial value of future pension installments, under New York law or under Hungarian law, to be paid out of money belonging to defendant that has been attached in this State; and, inasmuch as whatever recovery plaintiff may be allowed must be computed first in Hungarian money, what rate of exchange should be applied in order to determine the equivalent value in United States currency of forints in Hungary.

Considering these questions in order, we have concluded that the pension to which plaintiff became entitled upon being discharged from his office as president of defendant, was intended by the terms of his agreement to constitute his entire recompense in event of his being discharged before the expiration of his five-year term of employment. Where a sum is stipulated as damages for the nonperformance of a contract, the injured party cannot recover beyond that sum for a breach thereof (*Pettis* v. *Bloomer,* 21 How. Prac. 317). In creating plaintiff's pension rights, acting under power conferred by defendant's by-laws, the Minister of Finance ordained as follows: " The President/Chairman is entitled to a pension/retirement pay if I should release/discharge him from his office prior to August 31, 1950 or if he should not be appointed again as President/Chair-

man for the period after August 31, 1950. * * * In the case mentioned * * * the basis for the computation of the pension/retirement pay to which the President/Chairman is entitled shall be 50% of the yearly total of the compensation and other benefits to which the active President/Chairman of the Central Corporation of Banking Companies shall be entitled from time to time (in the future), and this amount shall be paid in monthly instalments in advance.''

By a subsequent rescript of November 16, 1946, plaintiff's pension or retirement pay, along with that of the vice-presidents, was continued at 50% of his actual compensation, but to '' be increased by a further 2% after each year completed by them in the legal relationship of employment.'' This reinforces the idea that it was contemplated that the relation of plaintiff to the corporation might be ended during the term, without incurring liability of P.K. other than payment of the pension. The $13,693 awarded to plaintiff for unpaid salary during the unexpired portion of his term of employment from September 1, 1947 (to which date it was stipulated that he was paid his regular salary), until August 31, 1950 (the end of his five year term) must be eliminated.

Once it has been held that plaintiff's employment might be terminated at any time within the five-year period without subjecting defendant to liability other than for payment of the pension, we are confronted with the effect of the 1948 Hungarian decrees, and with the interrelated question of whether the pension installments payable periodically can be commuted into a lump-sum recovery. In *Freund* v. *Laenderbank Wien* (277 App. Div. 770) a lump sum was awarded for loss of pension rights which were destroyed by an unlawful discharge before the expiration of a term agreement of employment. The decision depended upon the concept that the employee's term agreement was broken, that the pension rights were lost as a result of the discharge and should be evaluated in determining how much the broken contract was worth. In the present case, plaintiff's right to receive a pension was not destroyed but was brought to fruition by the discharge. The basis for plaintiff's recovery of a lump sum is not his discharge, since that is what matured his right to be paid his retirement allowance, but the neglect of defendant to pay any pension installments and its repudiation of its fundamental obligation to pay anything.

The conclusion is inescapable that plaintiff's *de facto* banishment from Hungary in 1947, coupled with the 1948 decree that no pension installments should be paid to anyone remaining out of Hungary for more than three months, constituted a complete repudiation of defendant's liability to pay to plaintiff any pension or retirement allowance. P.K. had become so involved in the government by the communist accession to power, that these acts are to be ascribed to P.K. Moreover, the Hungarian Government controlled P.K. through its ownership of the class B stock.

If the doctrine of anticipatory breach of contract applied to an agreement for the payment of money in the future by way of pension or annuity, there could be little doubt that defendant's basic obligation to pension plaintiff was disclaimed. Defendant contends that plaintiff's deprivation of citizenship and the 1948 communist decrees were valid acts by a foreign government recognized by the United States, and that the courts of New York ascribe to them full force and effect citing *Dougherty* v. *Equitable Life Assur. Soc.* (266 N. Y. 71). The most that could be claimed for that case would be that confiscatory Soviet decrees are binding upon our courts in the case of an insurance policy issued in Russia to a Russian, payable there in Russian money by an insurance company licensed to do business under Russian law. *United States* v. *Manhattan Co.* (276 N. Y. 396), however, as well as the concurring opinion by LEHMAN, J., in the *Dougherty* case, indicate that our public policy does not require us to enforce foreign decrees of confiscation, even by recognized countries, against persons who were not citizens of those States at the times when the edicts of confiscation were issued. In the instant case, plaintiff's Hungarian citizenship had been revoked and he was living in exile when his pension rights were finally and completely repudiated in 1948. These decrees were therefore not binding upon him, nor can defendant successfully assert them as a defense since (unless they bound plaintiff) they were invalid and ineffective as contrary to our public policy (*Plesch* v. *Banque Nationale de la Republique d'Haiti*, 273 App. Div. 224, and cases cited, affd. 298 N. Y. 573).

The trial court did not base its award of a lump sum to plaintiff upon the New York law relative to anticipatory breach of contract. That doctrine has usually been applied only to contracts of a special character, and "has no application to contracts for the payment of money only, in instalments or

otherwise " (*Indian Riv. Islands Corp.* v. *Manufacturers Trust Co.*, 253 App. Div. 549, per COHN, J.; *Kelly* v. *Security Mut. Life Ins. Co.*, 186 N. Y. 16; *Gilbert* v. *New York Life Ins. Co.*, 238 App. Div. 544, 551; *Baer* v. *Durham Duplex Razor Co.*, 228 App. Div. 350, 353; *Bauchle* v. *Bauchle,* 185 App. Div. 590; *Werner* v. *Werner,* 169 App. **Div.** 9, 15; *McCaskey* v. *Cumberland Glass Mfg. Co.*, 193 App. Div. 856, 858; *N. Y. Life Ins. Co.* v. *Viglas*, 297 U. S. 672; *Mobley* v. *N. Y. Life Ins. Co.*, 295 U. S. 632, Note, 99 A. L. R. 1171; *Kuhn* v. *Pacific Mut. Life Ins. Co.*, 37 F. Supp. 102, 105; 5 Williston on Contracts, 3740–3743, § 1330A and notes; Restatement, Contracts, §§ 316–318, including the New York annotations under § 318 and the 1948 revision of § 318).

After stating that the court, rather than the jury, is to determine questions of foreign law under subdivision B of section 344-a of the Civil Practice Act, the trial court said, in overruling the jury's determination against awarding a lump sum: " The Court accordingly resolves the aforesaid conflict in the evidence as to the right *under Hungarian law* to award a lump sum equivalent of the periodic pension payments in favor of the plaintiff. The evidence having established that the normal life expectancy of a person of plaintiff's age is 19 years and the jury having had no other guide as to life expectancy, and the evidence being uncontradicted that the plaintiff is a person in good health and that he but recently passed a medical examination in New York City for the purpose of having his life insured, and the defendant while denying that plaintiff is entitled to a pension consented to the use of a 4 per cent discount factor in computing the value of the periodic pension, the Court determines such commuted value to be $56,988." (Italics supplied.)

This basis of decision appears to be sound, nor could the jury have come to any other conclusion, provided that the finding by the court as to Hungarian law is supported by the record or by matters of which the court takes judicial notice.

There are circumstances in this case which would appear to lead to the commutation of plaintiff's periodic pension payments into a lump-sum award under Hungarian law. There was received in evidence during the testimony of plaintiff's Hungarian legal expert, Dr. Gorog, an exhibit entitled " Unifying Decisions " of the Hungarian Curia, reading as follows:

" P. I. 152/1941 * * * In lieu of an annuity, a final award may be made in a lump sum either at the request of

the damaged party or of the party liable but only where this exceptional disposition is justified by the particular circumstances of the case.''

Concerning this, Doctor Gorog testified: '' In the case of pension claims, the courts ordinarily would order periodic payments of the pension in the future. However, where the circumstances of the case and the interests of either party require it, the Court may order lump sum payments.''

He added that this is a general principle of Hungarian private law, applicable in general to contractual damages as well as to noncontractual damages. The question is whether the facts of this case fall within the prescription of the Hungarian Curia, that a lump sum shall be granted '' only where this exceptional disposition is justified by the particular circumstances in the case.'' It is pointed out in the brief for respondent that the civil law, rather than the English common law, is at the foundation of the Hungarian legal system, that the doctrine of *stare decisis* does not apply, and that continental lawyers are not accustomed to search for a precedent applicable to the particular facts of the dispute with which they are concerned, but to consider how far the facts of the individual case are covered by some general principle or principles (Gutteridge on Comparative Law, p. 89; Pound: The Theory of Judicial Decision, 36 Harv. L. Rev. 641). Doctor Gorog testified that in considering what were special circumstances, an Hungarian court would consider whether it would be a hardship upon a defendant to make a lump sum payment, and whether a plaintiff would be protected if he merely obtained a judgment for periodic payments. He added: '' Perhaps the Court would stipulate a security for future payments, if this is in the equitable interests of the parties.'' The following colloquy then occurred:

'' The Court: But where the Court did not provide for a security to cover the amount of the judgment and it would be no great hardship on the defendant, they could, if the situation warranted it, make an order for a lump payment?

'' The witness: (In English) That is right.

'' The Court: Anticipating all the payments for the life of a person?

'' The witness: (In English) If it is not too great a hardship for the defendant to pay in a lump sum, then the judgment could be in a lump sum, but ordinarily — I mean in most cases, the adjudication is in the future monthly installments.''

The hardship upon plaintiff, if he be denied a lump-sum recovery, is sufficiently great to prevent him from recovering for most of his pension. He could obtain the installments which have already accrued, but the future installments could not be recovered, inasmuch as the undertaking which discharged the attachment against defendant's New York funds would cover only whatever recovery may be obtained in this action. Since plaintiff cannot return to Hungary, a determination that he may recover annual installments as they mature would be an empty gesture. There are sufficient factors in this case, as we view it, to uphold a lump sum award under the text of the " Unifying Decisions " of the Hungarian Curia as testified to by Doctor Gorog. The repudiation of plaintiff's pension rights consisted not in the termination of his employment, but in what amounts to his banishment from Hungary and the revocation of his citizenship in 1947, and in the cancellation of his pension rights in their entirety by the 1948 decrees, which abolished all pension rights of persons remaining outside of Hungary for more than three months. These decrees are not to be regarded by us as having bound plaintiff, since he was no longer in Hungary nor an Hungarian national, and the only manner in which payment of his pension can be secured, is by allowing him to recover its present actuarial equivalent out of assets of defendant in the United States where he now is. Inasmuch as plaintiff left Hungary under compulsion before the communist accession to power had been completed, we consider that his case is to be decided under the law of the Hungarian regime established in 1945, and recognized in that year by the United States.

The amount of the recovery remains to be considered. If, as we hold, plaintiff might be discharged at any time during his five-year term of employment without entailing further liability upon defendant than payment of his pension, it follows that the annual pension payments must be computed at 54% rather than at 60% of plaintiff's annual compensation, since he had completed but two years after the commencement of his term. Although he was discharged just before the expiration of his second year of employment, he was paid for two full years of service through August 31, 1947. Under the directive of November 16, 1946, by the Minister of Finance, the pensions of the president and two vice-presidents of defendant were to be increased from 50% " by a further 2% after each year completed by them in the legal relationship of employment." The

parties stipulated that at the time of his discharge plaintiff's annual rate of compensation was 84,285 forints. Fifty-four per cent of this sum amounts to 45,514 forints. The latter sum should be capitalized in forints as of September 1, 1947, using the other factors hereinbefore mentioned, and adopted by the trial court. From the said lump sum should be deducted the 32,460 forints which plaintiff stipulated that he received from defendant in loans.

Plaintiff's annual pension payment of 45,514 forints is equivalent to $3,905.10 at the stipulated official rate of exchange of 8.58 cents per forint. Whether the official rate of exchange should be applied in the case of a transaction such as this need not be considered, inasmuch as we have concluded that the parties stipulated that it was to be used in measuring any recovery to which plaintiff might be held to be entitled. Plaintiff had a life expectancy of twenty-one years when he was removed as president of P. K. in August, 1947. This means that the value of his pension, capitalized at the end of August, 1947, at the stipulated rate of 4%, was $54,784.65. Deducting the contra-account of 32,640 forints, amounting with interest to $2,812.63, leaves a recovery in the sum of $51,972.02, plus interest thereon at 6% from September 1, 1947, to the date of the judgment, March 20, 1951, amounting to $11,087.32, making a total recovery at the date of the judgment of $63,059.34.

A few words more are necessary concerning the rate of exchange. Plaintiff would be entitled to judgment in Hungarian forints, were it not for the rule that judgment can be rendered only in the currency of the forum. It has been held that the official rate is not necessarily to be employed in measuring the recovery in terms of United States currency, where it appears that the conversion of foreign exchange is blocked for the purpose in question (*Hughes Tool Co.* v. *United Artists Corp.,* 279 App. Div. 417, and cases cited). Upon the other hand, in *Perutz* v. *Bohemian Discount Bank* (279 App. Div. 386), the official rate was used for the reason that the parties stipulated in effect that it was to be applied to the transaction in suit, there being no evidence that transfers of funds for the purpose in question were blocked.

The parties stipulated at the time of the trial of the instant case that " The official remittance rate of the Hungarian forint during the month of August, 1947, was and now is, 8.58 cents ($0.0858) per forint.'' Although the written stipulation does not state that the official rate should govern the computation

of whatever recovery might be awarded in this case, it was so interpreted at the trial. During plaintiff's examination in his own behalf at the commencement of the trial, the following colloquy occurred:

" Q. Now, when you accepted your office, the currency in Hungary was called the pengo? A. Yes.

" A Juror: What was the dollar at that time?

" [Plaintiff's counsel]: I don't know, but we will ask.

" The Court: Will that become an important issue in this case? I understood there was an agreement about the *applicable rate of exchange* at a certain date.

" [Defendant's counsel]: If the Court please, we have stipulated with respect to the salary at the time of this discharge, *the dollar equivalent.*

" The Court: Well, wouldn't that be enough for your purpose?

" [Plaintiff's counsel]: We will read the stipulation into the record. That will perhaps shorten the proof.

" The Court: *That will make it unnecessary for us to have the value.*" (Italics supplied.) Following this colloquy, the stipulation respecting the quotation of the official remittance rate was offered and received in evidence without objection. Although not conceding that plaintiff is entitled to any recovery, defendant's counsel thus made it clear at the outset of the trial that defendant consented to the use of the official remittance rate of 8.58 cents to the forint for the purpose of computing whatever recovery plaintiff might succeed in obtaining. Plaintiff's counsel was entitled to rely upon that concession in omitting to introduce affirmative evidence of value of blocked Hungarian forints in terms of United States currency. After the evidence had been closed, defendant's counsel, departing from his previous concession, sought to show that there is a black market for selling Hungarian money in New York. After an off-the-record conference between the court and counsel the following occurred:

" [Defendant's counsel]: It is hereby stipulated between the parties that there is a black market in New York and New Jersey for Hungarian forints and that such currency can be and is currently sold and bought at the rate of 3 cents per forint.

" [Plaintiff's counsel]: Plaintiff insists that the stipulation dated March 10, 1951, Plaintiff's Exhibit 7, fixing the official remittance rate of the Hungarian forint during the month of

August 1947 at 8.58 cents at that time and also on March 10, 1951, the date of the stipulation, that that is the rate applicable to any computation for the purposes of any judgment which may be rendered in this case.''

The court charged the jury that the parties had stipulated that the official rate of exchange was to be applied in computing the amount of any recovery. Although the court added that defendant nevertheless insisted that any amount due be computed at the black market rate, the subject was concluded in the following manner:

'' [Defendant's counsel]: I further ask your Honor to charge that if there was a contract in this case, that any payment thereunder would be in Hungarian currency, and that by bringing the action in this jurisdiction, the plaintiff did not acquire any right to a more favorable judgment than he would have obtained, had the action been brought in Hungary.

'' The Court: Well, I so charge you with the exception that the Court takes notice of the fact that this Court has jurisdiction over this action and that *there is a stipulation in evidence fixing the applicable rate on the moneys involved in this action.''* (Italics supplied.) Finally, in response to a request by the jury for additional instruction, the court repeated that the parties had stipulated that the applicable rate was the official rate of 8.58 cents.

These excerpts from the record indicate that the action was tried upon the theory that the official rate of exchange was to be applied, by consent, for purposes of computation. It is unnecessary to consider whether the rate should be taken as of the time of the breach of contract or as of the time of the judgment, inasmuch as the stipulation is that the official rate had not changed at the time of the trial.

The judgment appealed from should be modified by reducing the amount of the judgment entered March 20, 1951, to $63,059.34, plus the trial costs, but without costs of this appeal, and as so modified should be affirmed.

CoHN, J. (concurring). I am in accord with the opinion of Mr. Justice VAN VOORHIS, and with the result therein reached, save that I would be inclined to hold that execution on the judgment of $63,059.34 be stayed until plaintiff obtains the required license from the Hungarian Government. However, in view of the decision by this court in *Hughes Tool Co.* v. *United Artists Corp.* (279 App. Div. 417) and *Perutz* v. *Bohe-*

*mian Discount Bank* (279 App. Div. 386) in which I expressed my views in a dissenting opinion, I now feel constrained to concur with respect to that point as well.

PECK, P. J. (dissenting in part). In my view, plaintiff had a firm contract for five years, the breach was actual and he is entitled to recover in accordance with the judgment rendered. Therefore, I vote to affirm.

GLENNON and DORE, JJ., concur with VAN VOORHIS, J.; COHN, J., concurs in opinion; PECK, P. J., dissents in part, in opinion.

Judgment modified by reducing the amount of the judgment entered March 20, 1951, to $63,059.34, plus the trial costs, but without costs of this appeal and, as so modified, affirmed. Settle order on notice.