254 F.2d 417
 JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, a corporation, Appellant,
v.
Mary Troutfelt COHEN, Appellee.
Mary Troutfelt COHEN, Appellant,
v.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, a corporation, Appellee.
 No. 15619.
 United States Court of Appeals Ninth Circuit.
 March 26, 1958.
 
 Henry C. Clausen, Richard G. Burns, Keesling & Keesling, William H. Keesling, San Francisco, Cal., for appellant.
 Brobeck, Phleger & Harrison, Moses Lasky, Richard Haas, San Francisco, Cal., for appellee.
 Before HEALY, LEMMON and BARNES, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 This is a suit between a citizen of New Mexico and a citizen of Massachusetts begun in the Superior Court of San Francisco and removed to the Federal Court pursuant to 28 U.S.C. §§ 1332, 1441. Removal was proper. The District Court found a contract of insurance to exist, that defendant breached its contract, and awarded the full amount then due, and to become due, under the contract. The District Court refused to award damages for breach of an alleged warranty against having to employ any firm or persons to collect on the contract. Defendant insurance company appeals from the judgment awarding damages for breach of contract, and plaintiff cross-appeals from the denial of damages for breach of the alleged warranty. This Court has jurisdiction under 28 U.S.C. § 1291.
 
 
 2
 Plaintiff Mary Troutfelt Cohen is the surviving spouse of the insured Martin E. Troutfelt, and beneficiary of a contract of insurance between her deceased husband and the defendant John Hancock Mutual Life Insurance Company, a corporation, hereinafter, the "company." The facts must be stated in some detail in order that we may understand the case.
 
 I — Facts and Findings
 
 3
 Troutfelt originally applied to the defendant company in writing under date of February 1st, 1939 for a twenty-pay life policy, stating he wanted family income provisions for a twenty year term. (Form A, dated 2-1-39.) Such a policy, numbered 3171136, with such twenty year term, was thereafter issued.
 
 
 4
 On May 31, 1939 the insured applied in writing to the company to convert or exchange his existing policy to a "15 year Endowment with Family Income Provisions Policy." No space existed on such application for the insured to designate the term of the "Supplementary Provision respecting Family Income," which was to be part of the policy. But he was informed and on his "Application for Exchange or Conversion" dated May 31, 1939 he represented:
 
 
 5
 "The statements made in the application on which the said original policy was issued, a copy of which is to be attached to and made a part of the said new policy, are hereby declared to be true and complete, and are confirmed as of the date of this application, and it is agreed that the said statements shall be accepted by the said Company as the basis for the new policy in like manner and with the same effect as if the said statements were herein specifically set forth."
 
 
 6
 Sometime after May 31, 1939 and before July 11, 1939 Troutfelt received from the company a form of application, to be filled in, "For Supplementary Provision for Family Income, to be attached to Existing Policies." Although this form is apparently signed and filled in by the insured (Troutfelt) in ink, three blanks thereon are filled in by typwritten figures: to-wit, the figures "15", "10", and "$44.30", in the following two "boxes":
 
 
 7
 "11. Term of the Supplementary Provision
 ... 15... years.
 (Insert 10, 15, or 20)
 14. Premium to be paid Amount of
 for ... 10 ... years Premium:
 (Insert 5, 10, or 15) $44.30"
 
 
 8
 It is an admitted fact that "all typewriting was inserted on the form by a representative of defendant and none by Martin E. Troutfelt." This application is dated July 11, 1939.
 
 
 9
 On July 27, 1939 Policy No. 3223099 (the policy in suit) was issued under date of February 24, 1939; it being a 15 year Endowment Policy with premiums payable for 15 years. The relevant documents attached to the policy and made a part of it were: (1) a photostat of the prospective insured's February 1, 1939 Application for the original policy — Part A, Statements to the Company Agent (hereinabove mentioned); (2) a photostat of the insured's May 31, 1939 Application for Exchange or Conversion; (3) a photostat of the insured's July 11, 1939 Application for Supplementary Provision for Family Income; and, (4) a printed form No. 1260 denominated "Supplementary Provision for Family Income with Benefit for total and Permanent Disability Waiver of Premiums." This is the crucial document.
 
 
 10
 Inserted in this printed form by means of a typewriter were: (a) the number of the new policy, "3223099"; (b) the name of the insured, "Martin E. Troutfelt"; (c) the figures "20" (on two occasions) as the number of years from date of issue within which the insured's death must occur and during which the family income payments were to be made to the beneficiary; (d) the figure "$43.20" as the annual premium for the "annuity certain"; (e) the figure "$1.10" as the annual premium for the waiver of the annuity certain premium if under the permanent and total disability provisions there occurred a waiver of its premiums; and, (f) the figure "15", representing the number of years the special "annuity certain" and total and permanent disability premiums would be payable, "in addition to and under the same conditions as the regular premium under the policy."
 
 
 11
 Thus, the company through a claimed scrivener's error,[1] issued a 15 year policy with a 20 year family income provision with premiums to be paid for 15 years, when it assertedly "always limited itself" to a 15 year family income provision with premiums payable for 10 years in any 15 year Endowment Policy.
 
 
 12
 The insured died on June 28, 1945 within the 20 year period and with all premiums paid. Due proof of death was made to the company; the policy with all its riders was delivered to the company, and on July 26, 1945 the policy was endorsed by the company as follows:
 
 
 13
 "Insured died June 28, 1945. Settlement in accordance with the Supplementary Provision for Family Income, dated February 24th, 1939, attached hereto.
 
 
 14
 John Hancock Mutual Life Ins.
 Company
 by (signed) Elmer L. French
 Secretary
 Dated at Boston, Mass., July 26,
 1945."
 
 
 15
 This Supplementary Provision for Family Income contained the following material provisions:
 
 
 16
 "If * * * the death of the Insured shall occur within 20 years from the date hereof [February 24, 1939], the Company * * * will, in lieu of immediate payment of the amount insured in one sum, pay to the beneficiary * * * on the first day of each policy month following the death of the Insured, a monthly income * * * the last monthly income payment to be made on the first day of the policy month directly preceding the expiration of 20 years from the date of issue of the provision. Upon the expiration of the said period the Company will pay the amount insured. * * * (here $5,000).
 
 
 17
 * * * * *
 
 
 18
 "The special premium [for this monthly income] will be payable in addition to and under the same conditions as the regular premium under the policy during 15 years from the date of issue of this provision." [Emphasis added.]
 
 
 19
 Pursuant to the two documents last mentioned above, after the insured's death the company paid to the beneficiary each month the sum of $49.98 to and including February 1st, 1954. The company then offered to make to plaintiff a lump sum payment of $4,993.59, "due and payable on February 24, 1954," but refused to pay any further monthly sum. The beneficiary refused the lump sum payment.
 
 
 20
 Defendant claimed below and here claims that the contract agreed upon provided, as to family income benefits, only 15 years (to February 1, 1954) of monthly payments in return for 10 years of premiums, as shown by the application allegedly submitted by the insured; and that the policy as written contained a clerical error and therefore did not represent the contract of the parties. Mistake was raised as an affirmative defense and by way of counterclaim for reformation. Both the defense and counterclaim were rejected by the District Court as unproved and barred by the statute of limitations.
 
 
 21
 The only testimony respecting the alleged mistake was that of defendant's San Francisco clerk who stated that the application when received some seventeen years earlier was blank as to the terms of the family income supplement; that it had been filled out by the insurer and returned for signature of the insured; and that the company would never issue family income benefits for a period in excess of the premium payments of the main policy, i. e., 15 years in this case. Thus defendant asserts the application was the contract, and the policy contained a clerical error entitling the insurer to reformation or the defense of mutual mistake.
 
 
 22
 The trial court found that the insured neither knew nor could reasonably have known of a mistake in the family income provisions of the policy as received and that the policy as received was the contract between the parties.[2]
 
 
 23
 Additionally the court found that the insurer could have discovered its alleged mistake in 1939 or 1945, — both times the company having the policy for processing relative to the payment provisions and both times the policy having been checked and signed by officers of the insurer.[3] Thus the court rejected the affirmative defense of mistake and denied the counterclaim for reformation.
 
 
 24
 The court also denied plaintiff's claim for damages arising from the following clause in the policy: "It is not necessary to employ any firm or person to collect the proceeds of this policy." The court rejected the argument that this was a warranty breached by this suit and entitling plaintiff to recover damages measured by attorney's fees. Plaintiff cross-appeals this result.
 
 Appellant states in its brief:
 
 25
 "* * * the Court below found that the terms of the contract between the company and the insured are those found in the written policy. The Court also found that there had been a scrivener's mistake, but ruled that it was merely a unilateral mistake, since insured neither knew nor suspected, nor reasonably could or should have known or suspected that a mistake had occurred. Finally, it was ruled that the insurance company was negligent in not discovering the mistake on each of the occasions when it had possession of the original policy. From the facts as thus determined, the Court then held that defendant did not have a right to relief, and that even should such right have once existed, it was now barred by the statute of limitations. The Court then held defendant in breach of its contract, applied the doctrine of anticipatory breach, and rendered judgment for plaintiff in the sum of $8000.00 plus various sums of interest. * * *" Appellant's Opening Brief, p. 6.
 
 II — Alleged Error
 
 26
 Appellant relies on seven specifications of error. The first five of them relate to the court's findings, and are as follows:
 
 
 27
 "1. The Trial Court erred in finding that by the terms of the contract between this appellant and the insured the said insured was to pay premiums for 15 years from the effective date thereof.
 
 
 28
 "2. The Trial Court erred in finding that by the terms of said contract this appellant agreed to make monthly payments of $50.00 per month to plaintiff for a period extending to and including February 1, 1959.
 
 
 29
 "3. The Trial Court erred in finding that the said insured did not know nor suspect, nor reasonably could or should have known or suspected any mistake in writing the premium payment term in the supplementary provision for family income as 15 (instead of 10) years, or in writing the income payment period therein as 20 (instead of 15) years, and in finding that such a mistake was the unilateral mistake of defendant alone.
 
 
 30
 "4. The Trial Court erred in finding that in the exercise of ordinary care or reasonable diligence, this appellant could have discovered its alleged mistake in 1939, or in 1945.
 
 
 31
 "5. The Trial Court erred in finding that this appellant discovered its alleged mistake in 1939 or at the latest on July 26, 1945." Appellant's Opening Brief, pp. 7, 8.
 
 
 32
 We are satisfied no error was committed by the trial court in making such findings, which we now consider.
 
 III — The Contract of Insurance
 
 33
 The difficulty with appellant's position is that it persists in urging here, as it did below, that the application represents the contract; "that a prior agreement was reached" and therefore is controlling over the erroneous terms embodied in the subsequent policy both as "secondarily" issued on July 27, 1939 and as modified by endorsement after the insured's death in 1945. This is simply not so. No agreement was reached until the policy was written in its final form.[4]
 
 
 34
 Defendant urges it sustained its burden of proof in showing the family income rider to have been issued in error by producing the only witness who testified in person, one Dennis J. Lawton, an office supervisor or general clerical clerk for the defendant corporation's Mission office. In 1939 he had performed the same duties under another title. On direct examination he testified (1) that by the company's rate book a 20 year family income rider, with premiums payable for 15 years would cost $52.95 per year for $5,000 coverage, and that a 15 year family income rider with premiums payable for 10 years, would cost $43.20 per annum for $5,000 coverage; (2) that the supplementary riders "cannot" be issued for a period longer than the policy period; (3) that the company keeps no copy of the policy itself after issuance; and, (4) that premiums paid through mistake of the insured are ultimately refunded. On cross-examination it was shown through him (1) that the policy here in dispute was issued in Boston; (2) that it was company policy to have such a policy delivered to the insured by mailing through the San Francisco office.
 
 
 35
 The one witness who testified on appellant's behalf had no specific recollection of the transaction in question nor was there any evidence that he had handled it. He was testifying to the usual course of business. No evidence was introduced by defendant as to how or when or by whom its alleged mistake was discovered.
 
 
 36
 The defendant's position is clearly shown by a "question" asked of the witness Lawton by defense counsel (though later withdrawn): "Q. Now, it is the company's position that the company would never have issued a 20 year family income rider on a 15 year endowment policy. Would you please explain to his Honor why the company would not do so?"
 
 
 37
 The fact is that the company did issue such a rider on such a policy; that payments in the amount fixed by the company, though erroneous for the coverage promised, were paid by the insured quarterly from August 24th, 1939 to the time of his death in June 1945. But of this error he had no knowledge during his lifetime. Thereafter and on July 26th, 1945 the insurance company, with that portion of the policy before it which it thought necessary to obtain or retain, agreed to pay family income monthly in accordance with the rider attached to the policy, i. e., until "the first day of the policy month directly preceding the expiration of 20 years from the date of issuance," or to and including February 1, 1959.
 
 
 38
 Did the defendant meet his burden of proof that the policy as written and pleaded was issued in error? The only witness was the clerk mentioned above. From the findings, it is clear (Finding 7)[5] that the court did not consider this one witness, assuming he was believed, a sufficient source of evidence by which defendant could sustain his burden; and therefore believed and found unilateral mistake of defendant alone; that the insured "neither knew or suspected nor reasonably could or should have known or suspected any mistake therein." There is no basis in the evidence introduced for rejecting the trial court's view of the evidence before him, and the findings made thereon as to what the contract was.
 
 
 39
 Appellant also argues that if we assume a mistake was made, the statute of limitations was improperly applied because there was no discovery by defendant of its mistake. The court found the defendant could have discovered its alleged mistake in 1939 (Findings 8, 9) or at the latest on July 26th, 1945 (Findings 10, 11),[6] and that "It is not true that defendant discovered its alleged mistake in 1954 but, on the contrary, it discovered its alleged mistake in 1939 or at the latest on July 26, 1945" (Finding 12). The defendant seriously urges that this is unsupported by the evidence because of the fact that "no carbon copy or other duplicate of this written copy was retained by defendant;" and, having requested the insured's copy at his death, "the only purpose for the defendant having the written policy at that time was to stamp thereon its endorsement." We doubt if counsel for any insurance company would seriously urge us to ignore the rule that one who is presented with an insurance policy has the duty to read it. Fidelity & Guaranty Fire Corp. v. Bilquist, 9 Cir., 1940, 108 F.2d 713, 716; cf. Palmquist v. Mercer, 1954, 43 Cal.2d 92, 98, 272 P.2d 26, 30. Should this not apply equally to the company issuing it as to the party to whom it is issued? Particularly where the insuring company, for its own business purposes, follows a practice of destroying or, at least, not keeping, an exact record of its contractual obligations?
 
 
 40
 The court's finding that the appellant had means of knowledge and discovery of its mistake is amply supported by the uncontradicted evidence. The three year period of West's Ann. California Code of Civil Procedure, § 338(4) was applicable. Consolidated Reservoir & Power Co. v. Scarborough, 1932, 216 Cal. 698, 703-704, 16 P.2d 268, 270.
 
 
 41
 "Discovery" is a question of fact for the trial court. Uchida Inv. Co. v. Inagaki, 1952, 108 Cal.App.2d 647, 654, 239 P.2d 644, 649.
 
 
 42
 We not only can find nothing clearly erroneous here, but we fail to see how the trial court could have come to any other conclusion on the facts before him.
 
 
 43
 We find nothing to indicate that the law of New Mexico and California differ on the issues thus far raised.
 
 
 44
 We find no other matters raised in appellant's first five specifications of error which require comment.
 
 IV — Anticipatory Breach
 
 45
 Appellant's sixth alleged error is the finding that the appellant committed an anticipatory breach of said contract on or about May 13th, 1954.[7]
 
 
 46
 Appellant cites Cobb v. Pacific Mut. Life Ins. Co., 1935, 4 Cal.2d 565, 51 P.2d 84; 12 Cal.Juris. 2nd Contracts, § 250, and Restatement of Contracts, § 318. Cal.Juris. 2d cites the Cobb case as authority for the rule there can be no anticipatory breach of a unilateral contract in California, and Flinn v. Mowry, 1901, 131 Cal. 481, 63 P. 724, 1006, and Brix v. People's Mut. Life Ins. Co., 1935, 2 Cal.2d 446, 41 P.2d 537, (as well as Cobb, supra) for the proposition that
 
 
 47
 "* * * notwithstanding the failure or refusal to pay the installment, the other party cannot treat the contract as repudiated and demand payment in full, contrary to the terms of the contract providing for payment in installments."
 
 
 48
 Appellee here urges that there yet remains a condition to be performed by the plaintiff — the surrender of the policy to the defendant in Boston. This being so, and relying on Corbin on Contracts § 967, he states that the plaintiff can maintain an action at once for anticipatory repudiation. Corbin divides his discussion of repudiation of unilateral insurance contracts into two classes: First, "those in which the insurer undertakes to pay a definite sum of money at a specified future time or on the happening of a future event that is certain to occur, but the time of which is uncertain. * * * A second class consists of disability and annuity policies. * * *" ("Annuity" here is used, we presume, in its usual sense and not as an "annuity certain" in length of time as it was in the instant case.) In reference to the first class of cases, Corbin states:
 
 
 49
 "It is well settled by ample authority that an action lies at once for anticipatory repudiation by an insurer, either for the recovery of premiums paid or for damages." Corbin, § 968.
 
 
 50
 We need not go into Corbin's "ample authority," nor determine if this action falls within the limited type of actions which Corbin states can be filed, — for recovery of premiums or damages.
 
 
 51
 The contract here under consideration is a "payment certain" insurance contract. It has become, in effect, an unconditional unilateral contract for the payment of money in future installments. There were no contingencies which might occur to give the company a right to refuse payment. Even should the beneficiary have died, the "payment certain" would have been payable to her heirs. Particularly, after the insured's death and the company's endorsement on July 26, 1945 is this true. The insurer then undertook to pay certain sums each month and a larger certain sum at a later date.
 
 
 52
 This contract falls neither into Corbin's first class — a definite sum or sums payable on a future event certain to occur, but uncertain as to the time of occurrence — nor into his second class — "the disability and annuity policies providing for periodic payments for an indefinite time." It is a contract wherein the time for payment is certain and there remains no condition or covenant for performance by the plaintiff.
 
 
 53
 Corbin does not like the "dicta" to the effect that there can be no anticipatory breach of a unilateral contract because in the first class of cases the doctrine is in fact applied. (See cases cited at Corbin, § 968, n. 35.) Nor does he care for the rule that the doctrine of anticipatory breach is inapplicable to a case of an unconditional unilateral contract for the payment of money in installments, but he cites no authority to the contrary. (Corbin, §§ 965, 969.)
 
 
 54
 We are in essence here asked to hold that the doctrine of anticipatory breach applies to an unconditional unilateral insurance contract in a case where the insurer has promised to pay definite sums of money at specified future dates and that this should be declared by the Federal Court to be the law of New Mexico because an eminent writer and authority on contracts disagrees with the more recent New York cases and the Massachusetts rule and two Supreme Court cases. (Corbin, § 968, n. 34.)
 
 
 55
 We are asked to so rule in a case where the "present value" of future payments was not raised below, nor apparently considered by the trial court. Corbin states:
 
 
 56
 "Some of the courts denying that the insurer has committed a total breach by anticipation base their decision upon the ground that the contract is a unilateral contract for the payment of money. That this is not a good reason has already been argued in a previous section. The decision of the Supreme Court does not rest upon it; indeed, in the opinion rendered it is in part, at least, rejected. We differ with the court in holding that there was no total breach by anticipatory repudiation; but its reasoning and analysis may be otherwise approved. The decision itself need not be regretted, if it leads to the granting of the truly `appropriate relief' in all such cases. This is a single decree that money already overdue shall be paid, with interest, and that future installments shall be paid as they fall due. * * *" Corbin, § 969, pp. 893-4.
 
 
 57
 Williston on Contracts states the general rule to be "that no unilateral promise for an executed agreed exchange to pay money at a future time can be enforced until that day arrives." (Williston, § 1328; accord, Restatement, Contracts § 318.) With respect to the applicability of the doctrine of anticipatory breach to future disability payments, he says: "[T]here remained divided opinions until two recent decisions of the Supreme Court of the United States," citing Mobley v. New York Life Ins. Co., 1935, 295 U.S. 632, 55 S.Ct. 876, 79 L.Ed. 1621; New York Life Ins. Co. v. Viglas, 1936, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971; the Brix and Cobb cases, supra; and, 24 Calif.L.Rev. 216.
 
 Williston goes on:
 
 58
 "The only argument for allowing immediate recovery of a future payment due under such a (disability) policy is the hardship supposedly imposed on the insured of bringing successive suits." (§ 1330A.)
 
 
 59
 He then points out how this can be avoided by the courts' "full exercise of equitable powers." He quotes from Mobley v. New York Life Ins. Co., supra, to the effect that if the insured is
 
 
 60
 "* * * allowed a present recovery for all future benefits, the calculations on which insurance business is done would be upset, and the purposes for which the benefits were made payable only in installments would often be defeated." (Ibid.) Williston then criticizes as "extreme" the application of the doctrine to a non-insurance case in Texas,[8] although "the present value" was therein determined, after use of expectancy tables — a value not herein considered by the trial court.
 
 
 61
 We conclude the general rule to be that the doctrine of anticipatory breach has no application to suits to enforce contracts for future payment of money only, in installments or otherwise. Cobb v. Pacific Mutual, supra; Flinn v. Mowry, supra; Brix v. People's Mutual Life Ins. Co., supra; Sulyok v. Penzintezeti, 279 App.Div. 528, 111 N.Y.S.2d 75, 82; 105 A.L.R. 460; Restatement, Contracts, §§ 316-318; 5 Williston, Contracts, 3740-3743; 12 Cal.Jur.2d, Contracts, §§ 246-250; see also 24 Calif.L.Rev. 216.
 
 
 62
 Appellee seeks to distinguish the Brix and Cobb cases on the ground they deal with permanent and total disability only (which is true), and the Flinn v. Mowry case, as not a case of anticipatory breach, there being no repudiation. But he relies on Caminetti v. Manierre, cited as Caminetti v. Pacific Mutual Life Ins. Co., 1943, 23 Cal.2d 94, 142 P.2d 741, which states:
 
 
 63
 "The wrongful cancellation of a contract of insurance under the certain circumstances is somewhat analogous to a breach by anticipatory repudiation. In the instant case the old company is insolvent and is being liquidated. It cannot perform under the noncancelable policies it had issued. They have been in effect cancelled. The situation is thus analogous to a breach by anticipatory repudiation. Anticipatory breach is recognized in California. 6 Cal.Jur. 457. Upon the repudiation the promisee may immediately bring an action for future damages. Hollywood Cleaning & Pressing Co. v. Hollywood L. Service, 217 Cal. 131, 17 P.2d 712; Seymour v. Oelrichs, 156 Cal. 782, 106 P. 88, 134 Am.St.Rep. 154. And `It is true that in most cases the determination of future damage is surrounded with many difficulties, but it hardly rests with defendant to complain of such difficulties, since they exist only because of the wrongful act of the defendant, itself. Seymour v. Oelrichs, supra.' Hollywood Cleaning & Pressing Co. v. Hollywood L. Service, supra, 217 Cal. 134, 17 P.2d 713.
 
 
 64
 "The cases of Cobb v. Pacific Mutual Life Ins. Co., 4 Cal.2d 565, 51 P. 2d 84; Brix v. People's Mutual Life Ins. Co., 2 Cal.2d 446, 41 P.2d 537, and Robinson v. Exempt Fire Co., 103 Cal. 1, 36 P. 955, 24 L.R.A. 715, 42 Am.St.Rep. 93, were concerned only with the question of the recovery of the payments that might become due for continuance in the future of the existing disability, as well as payments past due. There was not involved the issue of damages for a total repudiation of the contract of insurance where it is beyond the power of the insurer to respond in the future for future damages." Caminetti v. Manierre, supra, 142 P.2d at page 746.
 
 
 65
 Appellant's reliance on 12 Cal. Jur. 2d, § 250 is criticized by appellee, who states correctly that "the statement of law in texts is no sounder than the cases that are cited to support the text." Appellee then cites the Caminetti case, which states Brix and Cobb and Robinson are not controlling because "there was not involved the issue of damages for a total repudiation of the contracts of insurance where it is beyond the power of the insurer to respond in the future for future damages." [Emphasis added.] There is not the slightest suggestion here that the John Hancock Mutual Life Insurance Company "cannot in the future respond for future damages." We recognize the possible distinction between "disability contracts" which are always, in effect, conditional, and contracts like the one in suit which are entirely unconditional. But we find no indication in either the law of New Mexico or of California[9] of an intent to depart from the majority view that unconditional unilateral contracts for the payment of money in installments are not the proper subjects for the doctrine of anticipatory breach.
 
 
 66
 It is our conclusion that the theory of anticipatory breach is not here applicable — to make it so where the defendant insurer has disputed liability in good faith would change the terms of the contract executed by the insurer and force him to pay now what he contracted to pay later; that the court should decree that money already overdue shall be paid now with interest; and that future installments shall be paid as they fall due, including the final payment.
 
 
 67
 What we have said with respect to the alleged error in holding an anticipatory breach controls the seventh specification of error, and requires us to hold the judgment as given to be error.
 
 
 68
 V — Failure to Award Attorney Fees as Damages for Breach of Warranty.
 
 
 69
 Just as we find no basis for holding the trial court committed clear error in determining there was a breach of contract by the company, so do we find no error in the court's refusal to find breach of an alleged warranty against having to employ any firm or person to collect on the contract. The one case cited by cross-appellant, Guardian Life Ins. Co. of America v. Brackett, 108 Ind. App. 442, 27 N.E.2d 103, is quoted correctly, but does not support cross-appellant's position. We assume, from the care shown by appellee's counsel in citing cases on their principal point, that had there been cases existing in their favor on this issue we would have heard of them.
 
 
 70
 We would consider it strange indeed for an insurer to guarantee the payment of attorney's fees in the event an honest dispute was carried by the insured to court, and lost by the insurer. Since the probable measure of damages for breach of the alleged warranty (were it one) is the amount of fees paid to collect on the policy, the alleged warrant is in effect such a guarantee. Did the parties understand the company guaranteed the insured attorneys' fees in the event of suit? We do not so understand their contract. The alleged warranty appears on the back of the policy, entirely separate from the numerous covenants and conditions contained therein. It is located so as to be seen by the insured as he unfolds the policy. Whatever the meaning of this isolated sentence may be, we cannot, without more direct expression of intent, conclude that it constitutes a warranty for costs, i. e., attorneys' fees, in the event of successful litigation against the insurer on the policy.
 
 
 71
 We find no error in refusing to award damages to cross-appellant.
 
 VI — Conclusion
 
 72
 The cause is remanded, with directions to award plaintiff an amount equal to payments due to the date of judgment, plus interest; decreeing that future installments shall be paid when they fall due, together with the final lump sum payment; and, that appellee be awarded her costs, both below and on this appeal.
 
 
 73
 Remanded with directions.
 
 
 
 Notes:
 
 
 [1]
 The court, in its written opinion, stated the defendant made a mistake, but the court made no finding of mistake, although it found and referred to defendant's "alleged mistake." We, of course, are bound by the findings. But we will refer in this opinion to the insurance company's "mistake."
 
 
 [2]
 Finding 7
 
 
 [3]
 Findings, 11, 9
 
 
 [4]
 The best proof of this is that under appellant's theory there were two inconsistent applications attached to and made a part of the policy. One asked for a 20 year family income provision; one a 15 year family income provision. Appellant does not state why the latter should prevail, except that it was later than the former in point of time. But the latter did not supersede the former. And it was the former 20-15 year provisions which weresubsequently inserted by the company in the policy "secondarily" issued, and subsequently specifically ratified.
 
 
 [5]
 Finding 7: "Defendant never informed said Troutfelt that said contract or any term or part thereof was a mistake or the result of a mistake, and said Troutfelt neither knew nor suspected, nor reasonably could or should have known or suspected, any mistake therein, and any mistakes in writing the premium payment term in the said `Supplementary Provision for Family Income' as 15 (instead of 10) years, or in writing the income payment period therein as 20 (instead of 15) years, or in any other respect, was not a mutual mistake but was the unilateral mistake of defendant alone." [Tr. p. 102.]
 
 
 [6]
 Finding 9: "In the exercise of ordinary care or reasonable diligence, defendant could have discovered its alleged mistake in 1939." [Tr. p. 103.]
 Finding 11: "In the exercise of ordinary care or reasonable diligence, defendant could have discovered its alleged mistake in 1945." [Tr. p. 104.]
 
 
 [7]
 Finding 14: "On or about May 13, 1954 defendant notified plaintiff in writing that it `does not consider it is liable for any further monthly payments under the family income provision', and that it would pay a final payment of $4,993.59 but only upon surrender of the policy. Thereby defendant committed an anticipatory breach of the said contract entered into between it and said Troutfelt." [Tr. p. 104.]
 
 
 [8]
 Pollack v. Pollack, Tex.Civ.App., 23 S.W. 2d 890, Tex.Com.App., 39 S.W.2d 853
 
 
 [9]
 Guitron v. Rodriguez, 105 Cal.App. 513, 288 P. 134, cited by appellee is authority for the general proposition that "when the repudiation of an executory contract results in a violation of the contract `in omnibus,' the injured party may treat the entire contract as at an end and sue for damages for the breach." (There plaintiff was awarded $1000 damages for breach of an oral contract for the sale of personal property, by the terms of which the vendor was entitled to $2700 in monthly payments of $150 each.) The plaintiff there wasnot suing to enforce the contract.