Harry JOSEPH, Appellant,

v.

DONOVER COMPANY, Inc., a corporation, Harry J. O'Donnell, Raleigh Chinn, Kinzua Corporation, a corporation, Mark F. Mathewson and Richard K. Bush, Trustees in Dissolution of Capital Timber Products Company, a corporation, Capital Timber Products Company, a corporation, Alvin Schwager, E. W. Stuchell, D. E. Wyman and M. H. Wyman, Appellees.

No. 15669.

United States Court of Appeals Ninth Circuit.

Nov. 6, 1958.

Rehearing Denied Jan. 8, 1959.

814

Lawrence William Steinberg, Beverly Hills, Cal., Pritzker, Pritzker & Clinton, Stanford Clinton, Chicago, Ill., for appellant.

Ryan, Askren, Mathewson, Carlson & King, Richard K. Bush, John E. Ryan, Jr., Graham, Green & Dunn, Frank T. Rosenquist, Wilbur J. Lawrence, Seattle, Wash., for appellees.

Before FEE, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is an action based on diversity of citizenship. 28 U.S.C. § 1332. Plaintiff is a citizen and resident of Illinois. Defendants were all corporate or individual citizens and residents of the state of Washington. The matter in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

Plaintiff appeals from a judgment of dismissal of plaintiff's cause of action pursuant to the trial court's granting of a motion to dismiss under Fed.R.Civ.P. 41(b). Plaintiff had sought to impose a trust upon one-half of the stock of Kinzua Lumber Company, a corporation, claiming the existence of a contract, a joint venture, an agency relationship, or a fiduciary relationship with one Harry J. O'Donnell. The trial court, by pre-trial order, required a separate trial with respect to the liability of the defendant O'Donnell, holding that if there were no liability on the part of defendant O'Donnell, there would be none on the other defendants. At the conclusion of the trial on this limited issue, the trial court dismissed plaintiff's cause of action.[1] Findings of Fact, Conclusions of Law, and a judgment were signed and filed, and a timely appeal taken here. 28 U.S.C. § 1291.

Appellant relies on six points, the first five being attacks on the judgment rendered as being wholly unjustified, and the sixth being that the court erred in limiting discovery procedures to the

---

1. The motion to dismiss was made after the plaintiff had closed his case in chief on the first issue, as limited, although defendants, prior to the close of plaintiff's case, had placed two witnesses on the stand. (Dr. Thomas Holmes and Hon. Wm. J. Lindberg.) Plaintiff had called defendants Chinn, O'Donnell and Dunn as adverse witnesses.

single issue of the liability of the defendant O'Donnell. This latter was apparently abandoned on appeal.[2] In any event, it was not well taken. Fed.R.Civ. P. 16 and 42(b). Cf. Fowler v. Crown-Zellerbach Corp., 9 Cir., 1947, 163 F.2d 773; McDonald v. Bowles, 9 Cir., 1945, 152 F.2d 741.

By stipulation, the law of Oregon was applicable with respect to the creation of the original legal relationship, if any, existing between the parties.[3]

▇▇ Under Oregon law, while the legal relationship of "joint adventure is not in a strict legal sense a co-partnership, the rules and principles applicable to a partnership relation govern and control the rights, duties and obligations *of the parties as to each other."* [Emphasis added.] Preston v. State Industrial Acc. Comm., 1944, 174 Or. 553, 149 P.2d 957, 960. "Partnership is the product of voluntary contract, express or implied." Id. 149 P.2d at page 961.

As appellee aptly points out, the Oregon Supreme Court in the Preston case stated that there can be no conclusive arbitrary test,

"but that the existence of a partnership depends substantially upon the *expressed* legal intent of the parties: What is the actual character of the relationship intended *in point of fact* and does that relationship amount to a partnership in point of law?

\*　\*　\*　\*　\*　\*

"Our law has always treated the partnership relation as founded in voluntary contract. It does not surprise parties into a partnership against their will, although it does not require an express agreement between them \* \* \*." Id. 149 P.2d at page 961. [Emphasis added.]

▇ The burden on the party asserting the joint venture is to prove both parties assented to the same thing on all essentials.[4] And, if the contract is implied, it can only be implied in fact and not by operation of law. Burnett v. Lemon, 1948, 185 Or. 54, 199 P.2d 910.[5]

2. Rystad v. Boyd, 9 Cir., 1957, 246 F.2d 246, 248; Peck v. Shell Oil Co., 9 Cir., 1944, 142 F.2d 141, 143.

3. "Counsel for all parties stipulated that the law of the state of Oregon governed any alleged relationship between Joseph and O'Donnell, the creation and termination of any such relationship, and the statute of frauds regarding any claim arising out of any such relationship, but the law of the state of Washington would govern any defense of laches with respect to such claim." [Tr. p. 245; Conclusions of Law, Tr. p. 280, para. II.]

4. In Reed v. Montgomery, 1947, 180 Or. 196, 175 P.2d 986, there was involved a contractual written document whereby various specific resources were pooled. The respective shares were determined, but: "It is understood that this a temporary agreement, further details to be included in a more particular agreement to be later drawn up between the parties." (175 P.2d at page 993.) After reciting the factual situation, the Oregon court (175 P.2d at page 995, et seq.) cited Williston on Contracts, Rev.Ed. § 45; 12 Am.Jur., Contracts § 23, § 24; 17 C.J.S. Contracts § 31, § 49; Restatement, Contracts § 32, and three earlier Oregon cases differentiating a fourth case; and then states what is directly in point in this case, in view of the trial court's findings:

"We said in a preceding paragraph that the appellants' brief takes for granted that the purported agreement is a valid, enforceable contract which created between the parties the relationship of joint adventurers. \* \* \*

\*　\*　\*　\*　\*

"[T]he agreement is incomplete, and, therefore, unenforceable." Id. 175 P.2d at page 996.

5. In Burnett v. Lemon, the Oregon Supreme Court said:
"Here we are not concerned with a case wherein a third person is seeking to establish liability against a partnership by reason of the conduct of the alleged partners in holding themselves out to the public as having such relationship. The distinction between that case and the one under consideration is thus clearly stated in Watson v. Hamilton, 180 Ala. 3, 60 So. 63:
" 'On the question whether the parties are partners inter se, the interest of no

Under Oregon law, this burden on the party asserting the existence of an oral joint venture is a heavy one.

In a case where the facts are extraordinarily similar to the instant case (even to the charge of the worthlessness of the appellee's contradictory testimony as to an alleged joint venture as equal partners in a timberland venture), the Oregon courts have spoken clearly. See Bogle v. Paulson, 1949, 185 Or. 211, 201 P.2d 733.

Appellant in his briefs does not directly meet the issues nor discuss the law enunciated in the cases of Preston v. State Industrial Acc. Comm., supra, Burnett v. Lemon, supra, nor Bogle v. Paulson, supra, relied on by appellees.

■ Appellant, in his opening brief, contents himself with pointing out that Call v. Linn, 1924, 112 Or. 1, 228 P. 127, 129, cited in Preston v. State Industrial Acc. Comm., supra, and the Preston case itself, as well as Lane v. National Ins. Agency, 1934, 148 Or. 589, 37 P.2d 365, are authority for the rule that the Oregon law "will regard their [the alleged partners'] conduct rather than their language in determining whether their vol-

untary associating (sic) in a business enterprise amounts to a partnership or not." 149 P.2d at page 961.

That is good law. The difficulty with such an argument by appellant, however, is that it overlooks not only the trial court's finding that there was no written agreement nor any oral agreement originally entered into during the evening of November 18, 1952, between Joseph and O'Donnell,[6] but also that the conduct of the parties at no time thereafter gave any proof or indication of any contract or agreement between them, whether of joint venture, agency, partnership, or a fiduciary relationship. (Findings of Fact, particularly para. XIII;[7] Conclusions of Law, particularly para. III.)[8]

In appellant's reply brief, he meets appellee's cases only by attempting to differentiate Mason v. Rose, 2 Cir., 1949, 176 F.2d 486, and Reed v. Montgomery, 1947, 180 Or. 196, 175 P.2d 986, and to rely on a New York district court case and San Francisco Iron & Metal Co. v. American Milling & Industrial Co., 1931, 115 Cal.App. 238, 1 P.2d 1008 (which the Oregon Supreme Court in Reed v. Mont-

---

third person being involved, stronger proof is required to establish the partnership than when the question arises as between the alleged partners and third persons. A partnership as to third persons may arise by mere operation of law against the parties by way of estoppel, etc.; but as between the parties themselves it only exists when such is their actual intention.' " 199 P.2d at page 915.

6. "During the evening of November 18, 1952, there may have been some casual conversation concerning the exploration of the possibility of negotiating for a purchase of Kinzua, but O'Donnell did not consciously or otherwise make or assent to any offer, proposal, agreement, commitment or understanding with respect to Kinzua, nor did any conversation or event of that evening lead Joseph to believe that O'Donnell had made or intended to make or assent to such an offer or commitment." Findings of Fact, para. V, Tr. p. 250.

7. "(3) At no time did Joseph or O'Donnell, either consciously or otherwise, make or assent to any offer, proposal, promise,

agreement, commitment or undertaking of any kind with respect to Kinzua or otherwise; nor did either of them intend so to do. At no time did either Joseph or O'Donnell authorize or intend to authorize the other to act for or on his behalf; nor did either of them assent or undertake, or intend to assent or undertake, to act on behalf of the other. Neither Joseph nor O'Donnell entrusted or placed any confidence in the other or intended so to do; and neither of them, intentionally or otherwise, acted or undertook to act with the other's interest in mind. In their conduct toward each other Joseph and O'Donnell dealt and intended to deal at arm's length with each other, and each retained and intended to retain full and unrestrained freedom of action in every respect." [Tr. pp. 273-274.]

8. "Plaintiff and defendant O'Donnell had no joint venture, agency, contractual, confidential, fiduciary or any other legal relationship with each other." [Tr. p. 280.]

gomery, 175 P.2d at page 996, specifically considered and distinguished). We are not advised why the Preston, Burnett and Bogle cases, supra, are not controlling.

By far the greatest part of appellant's briefs is devoted to the argument that the trial judge should have found that there was the meeting of minds necessary to form the joint venture. Five of appellant's ten points under "Argument" (I, III, IV, V and VI)[9] *assume* that the joint venture was proved to have been in existence. Appellant's Point II is that the trial court's finding of no joint venture is not entitled to great weight, and appellant's Point VII is that O'Donnell was so discredited that any reliance on any portion of his testimony is clearly erroneous. Appellant's Point IX is that "the Defenses of Laches, Estoppel, and Speculative Delay are Completely Inapplicable," and his Point X is that "The Legal Consequences of the Established Facts Requires Granting of Relief to Plaintiff."

■■ Appellee O'Donnell was the prevailing party below, and hence we must take that view of the evidence most favorable to him. He is entitled to the benefit of all favorable inferences from the facts proved relative to the issue of his liability. If, when so viewed, there was substantial evidence to sustain the findings, then the judgment may not be reversed by this Court unless there is no evidence whatsoever to support the judgment; unless the clear weight of the evidence is against it; or, unless the trial court was influenced by an erroneous view of the law. Stacher v. United States, 9 Cir., 1958, 258 F.2d 112, 116; Lewis Food Co. v. Milwaukee Ins. Co., 9 Cir., 1958, 257 F.2d 525; John Hancock Mut. Ins. Co. v. Cohen, 9 Cir., 1958, 254 F.2d 417; Vidales v. Brownell, 9 Cir., 1954, 217 F.2d 136.

As we have pointed out above, the trial court found as conclusions of law that no contract of joint venture ever, at any time, came into being; and further, that if any relationship ever existed between defendant O'Donnell and plaintiff, such relationship had terminated prior to August 17, 1953, to wit, by March 13, 1953; that plaintiff was estopped to assert any claim against O'Donnell or against any other defendant; and that plaintiff was barred by laches.

If each of these conclusions of law is supported by findings of fact and the findings of fact are supported by the record, as appellee has attempted to point out carefully and in detail in his Appendix II; then, unless the clearly erroneous rule applies, or the trial court has employed the wrong legal principles, we must affirm.

Appellant urges that we should not give great weight to the findings of the trial court in this case. He insists that

---

**9.** Under "Argument", appellant's points are headed as follows:

"I—Here Plaintiff States His Case— That Plaintiff, Learning of and Having Access to a Unique and Valuable Opportunity to Acquire an Enormously Valuable Timber Empire on Extremely Favorable Terms *and Entering With Defendant O'Donnell Into a Joint Venture* to Purchase the Same Equally, Was Pushed Out of His Own Deal by O'Donnell, a Fiduciary Who Sought to Purchase for Himself and Those of His Choosing, in Violation of His Trust, and Must Now Be Held to Account.

\*     \*     \*     \*     \*

III—*A Joint Venture*, Both by the Evidence and by Implication of Law, *Is Shown to Have Existed*, and Any Contrary Finding Is Clearly Erroneous.

IV—Defendant O'Donnell's Conduct for Many Months After November 18, 1952, Inescapably Admits the Existence *of the 50-50 Joint Venture* of Joseph and O'Donnell to Negotiate the Kinzua Purchase.

V—Joseph, Despite the Findings of the Trial Court, Which Are Clearly Erroneous, at All Times Intended to, Worked to, and *Was Prepared, Ready and Able to, Participate Equally* With O'Donnell's Group in the Purchase of Kinzua Lumber Company, and These Facts Were Well Known to Defendants.

VI—A Tale of Two Letters." [Appellant's Opening Brief, pp. 9, 25, 36, 46, 59.] [Emphasis added.]

the general principle that such findings are entitled to great weight "finds its application only where those findings genuinely depend upon the trial court's evaluation of the credibility of witnesses appearing before it whose testimony is conflicting and contradictory."

Appellant repeatedly refers to "the undisputed testimony"; "clear admissions"; "much undisputed evidence on established facts"; and "much documentary [10] and deposition evidence." We point out there also appears in the record *much* testimony which *is* disputed; clear admissions on *both* sides; and *much* oral evidence, in addition to much documentary evidence. We have a record of 4,266 pages, of which all but the first 306 and the last 20 pages are a transcript of testimony. Joseph testified for four days and 475 pages of testimony; O'Donnell for four days and 524 pages. The very heart of the case was bitterly disputed, *i. e.*, whether there was a meeting of the minds sufficient to create any legal relationship and establish legal liabilities between Joseph and O'Donnell on the evening of November 18, 1952 at Portland, Oregon. O'Donnell at first did not even remember meeting Joseph on that night, stating that he had first seen Joseph the next day. Joseph proved by written evidence, produced to back up his own recollection, that O'Donnell was mistaken.

Joseph testified that an express agreement was assented to by him and O'Donnell on that evening of November 18, 1952. O'Donnell testified that no agreement was reached on that date or at any other time. Chinn, a defendant, and the third person present, testified there was no agreement entered into at that time.

Appellant urges this Court to disregard the denials of Chinn and O'Donnell that there was an agreement, because such denials are "inherently incredible"; that this leaves Joseph's testimony that there *was* such an agreement "substantially uncontradicted" (sic); and hence there exists *no evidence* contrary to Joseph's position.

Granted that the trial judge *could* have agreed with Joseph's version of the transaction, the fact is that he did not. The trial court passed specifically on the credibility of witnesses telling opposing stories. He recognized he was doing so and explained why he came to the factual conclusions he did. Nothing could be clearer than the oral decision rendered at the conclusion of the trial by the able trial judge, which was made part of his findings by incorporation. We refer to it in the margin and make it a part of this opinion.[11]

---

10. There were over 630 written exhibits, but a large percentage of these were corroborative in their nature, or dealt with "side issues." None dealt directly with the most important aspect of the case—was there a contract of joint venture created on November 18, 1952?

11. Transcript of Court's Oral Decision rendered in the above cause in the District Court, by the Honorable George H. Boldt, United States District Judge:

"The Court: It is late in the day and I had not expected the argument to conclude until the day was ended; accordingly, I had not expected to render decision in this case today. On that account I do not have available any but the briefest of notes made largely during the argument. I am at the point of considering whether the case should be decided now or whether the interests of all concerned would be furthered by a written decision. In a written decision, of course, the Court could take the time to deal in detail with many facets of the case that could not possibly be covered in an extemporaneous oral decision.

"On the other hand, this case has been long pending in this court. Counsel and the parties have incurred and expended considerable expense, time and effort on the case, and if I may say so, the Court has wrestled mightily with the problems presented during the entire course of the trial and since the taking of evidence was concluded. This particular motion, the memoranda submitted, and the argument have been fully considered. Extensive time and thought have gone into it.

"I have concluded gentlemen, that I am as able now as I ever will be, to decide this matter as well as I can decide it, within my ability and experience. Accordingly, I will do so. I am the more persuaded to do this because, gentlemen, whether right or wrong about it, I have

no doubt whatever in my mind what the answer to this problem must be. I mean that the matter seems clear and certain to me even though I hope I am reasonably conscious of my own limitations and of the fact that many of the matters that are presented to me for decision here involve questions to which only the Deity could provide the true answers.

"The reconstruction of past events, in the great majority of cases, at least, is not now an exact science nor is it ever likely to be, human nature continuing as it is. All that I can do in this position is to exercise such reason and judgment as I have, in the light of such experience as I have had, on such evidence as has been presented to me. Absolute certainty is an impossibility in this naughty world. The best we can do is to have a moral certainty, a reasonable certainty, which may vary according to the circumstances. In my own mind I have a certainty to that extent on the questions presented to me here which I consider primarily questions of fact.

"I want to make two or three preliminary statements lest there be any misunderstanding. If these parties had an agreement amounting to a contract resulting in a fiduciary relationship between them, and it was violated by any of the defendants, whether intentionally or not, the Court would be just as indignant at such a breach of faith as the plaintiff's counsel, and I think quicker to grant relief than the plaintiff was to ask for it in this particular case.

"Prior to dealing with this case I had never met, nor as a matter of fact, ever even heard of Mr. Joseph or Mr. O'Donnell or Mr. Chinn, or any of the primary actors involved in this controversy. I never heard of them, as I say, and I have no acquaintance whatsoever with any one of them, and thus have made my judgment of the facts and of the credibility of Mr. Joseph, Mr. O'Donnell, Mr. Chinn, and Mr. Ternan solely on what I have seen and heard here in the courtroom.

"I want to say another general thing about the credibility of the witnesses. Part of the responsibility of a trier of the fact in weighing the credibility of witnesses is to look at them and to listen to them to try to evaluate the kind of people they are, and to gain some impression from the way they testify and from their appearance and demeanor as to what kind of people they are, how credible they are, and what weight and value should be given to their testimony.

Sometimes it happens, gentlemen, that the very forensic defects and inadequacies of a witness will speak more forcefully of his credibility and the meaning of the words he uses than if he were more glib, more positive and certain about the matters concerning which he gives testimony. I have seen the thing happen with juries time and again. It happens, certainly, with me as an individual. It has happened in this particular case. The very inadequacies of Mr. O'Donnell, as a witness, somehow or other have brought to me a conviction as to his integrity and credibility that might be difficult to understand simply from a reading of the cold record of exactly what he said.

"I cannot subscribe to the castigation of Mr. O'Donnell's character and of his testimony that counsel for the plaintiff have given in their briefs and argument, although I am far from resentful of their [making it].* It is their duty to make that contention [if they sincerely] believe the record supports it. I [haven't any doubt] of the professional integrity of plaintiff's counsel; I just can['t] agree with their view, and I don't agree with it. I must say that Mr. O'Donnell impressed me most favorably. Obviously, he is not a man that speaks glibly and readily. He is a lumberman, familiar with forests and the running of sawmills, but I should gather from hearing his testimony that he is inexperienced as a witness and as a person who is required to formulate his *thoughts into precise and exact words,* particularly in response to adroit and exhaustive examination by adverse counsel.

[10] "Apropos plaintiff's contentions concerning his testimony being uncontradicted in some particulars, I remind you of the rule that neither this Court, nor any other trier of fact, is obliged to accept as true the testimony of parties and interested witnesses merely because there may be no directly controverting testimony; particularly is this true if the so-called 'uncontradicted' testimony is found inherently incredible. Actually, in most, if not all, of the instances of uncontradicted testimony asserted by plaintiff, direct evidence to the contrary can be found in the record.

"Now, one other preliminary. The precise matter now before me is a motion to dismiss under Rule 41(b). Rule 41(b) provides in part: 'After the plaintiff has completed the presentation of his evi-

---

* Words within brackets supplied from stenographic transcript of District Court's proceedings.

dence, the defendant without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the grounds that upon the facts and the law the plaintiff has shown no right to relief.' The next following sentence reads: 'In an action tried by the Court without a jury, the Court as trier of the facts may then determine them and render judgment against the plaintiff. or may decline to render judgment until the close of all the evidence.'

[11] "I take that language to mean that in a non-jury case on a motion to dismiss, the Court may weigh the evidence, as the old phrase used to be, or evaluate the evidence, and if the Court feels that it can do so, reach a conclusion on the facts upon the evidence presented up to that time. I understood that counsel in this case agreed to that proposition when we suspended in November. I notice that there is some possible suggestion to the contrary in plaintiff's brief, but since no further point has been made of it, I assume that all concerned adhere to the views expressed at the conclusion of our hearing in November. In any case, for your enlightenment, and that is the only purpose of my speaking of it, I consider that I am permitted now, in the present posture of the case, to weigh and evaluate the evidence and to find the facts, if I feel that I can do so on the basis of the evidence before me.

"Ordinarily I would not give too much time to a motion to dismiss where a considerable period of time had been devoted to trial of the case, and only relatively little additional time might be necessary to hear the whole evidence. Generally I feel that it is desirable to have the entire evidence presented so that on review, if appeal be taken, there will be no limitation upon the questions presented on the appeal and the whole case may be finally disposed of more readily on review, regardless of the result of the appeal.

"In this particular case, however, it happens that the plaintiff has introduced substantial portions of the testimony of most, if not all, of the principal persons who might have knowledge of the facts of the case. Presumably, the testimony not offered at least would not affirmatively improve the plaintiff's case. Therefore, in this particular situation, I feel that it is especially appropriate that the Court very carefully examine the evidence presented and, if possible from that evidence, make a determination of the controlling facts. That is exactly what has been done during the presentation of the evidence and in the longer interval since. Consideration of the case has by no means been limited to the argument heard today. Many hours of careful and extensive study have been given to it.

[12] "Now, with that background, what are the problems? The very first step in this case is to determine what the relationship of or between Joseph and O'Donnell was during the period in question. It is clear that that relationship, so far as plaintiff's claim in this case is concerned, must be grounded in a contract. In other words, a contract in the full legal sense of that term is an essential basis of any right to relief plaintiff might have. The relationship called joint venture sounds in contract and without a contract the relationship does not exist.

[13–15] "Adverting to first principles and Hornbook law, we recall that a contract is a legally enforceable agreement between two or more parties. The essential elements necessary to transform an agreement into a legally enforceable contract include, among other things, competent parties, a subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. The element of mutuality of agreement, or mutual assent, frequently has been referred to in the law as a 'meeting of the minds' of the parties to the contract or agreement. To create a contract, then, the minds of the parties must meet as to every essential term of the proposed contract, and there must be a clear and unequivocal acceptance of a certain and definite offer in order that a mere agreement may become a contract. Therefore, it is necessary, among other things, that the minds of the parties meet as to the essential terms of the proposed contract. There must be a reciprocal assent to a certain and definite proposition between them. As long as any substantial or material matters are left open for further negotiation or consideration on an essential and necessary element of a proposed contract, the contract is not complete, and the agreement, if there has been such, is not enforceable as a legally enforceable contract.

[16] Now, those are all Hornbook propositions that every one of us has heard since our first year of law school. The question is, how do we apply those principles to this case. The sine qua non of Joseph's case has to be a 'meeting of the minds,' a specifically known and understood agreement, between him and O'Donnell, that they were going to make

a joint purchase of Kinzua. Irrespective of other contract elements that might be required, at least that one essential fact would have to be found as an indispensable element of plaintiff's case.

"The burden rests upon the plaintiff in the first instance to establish the existence of the joint purchase agreement as an element of a contract of joint venture. A mere preponderance of evidence would be sufficient to establish the existence of the contract in the first instance. The initial question that I have to concern myself with is whether there is a preponderance of the evidence here showing that Joseph and O'Donnell had a specific, definite, and clear offer and acceptance between them to the effect that they were going to make a joint purchase of this Kinzua property. Such a contract could only be established by either express words to that effect or by implication arising from the conduct of the parties or by a combination of both. There is no other possible way that it could arise, that basic contractual relationship between them.

"Now, let us consider each of those methods separately. The only spoken or written words claimed by Mr. Joseph to be express words amounting to such a contract are those that he said he spoke to Mr. O'Donnell and heard from him on November 18, 1952, in a bar at the University Club in Portland over a drink. Nowhere else are there claimed to be any express words sufficient to constitute a contract. After pondering this very long and arduously, I am completely satisfied that there were no express words of agreement passing between Joseph and O'Donnell which would amount in law to a contract. I cannot find that any such words were spoken by Joseph or, if so, that they were understood and assented to by O'Donnell.

"I am not going into the details of telling you why I have reached that conclusion, gentlemen, because there are a great many factors appearing in the evidence that lead me to that conclusion. I think you may have gotten one facet of it from the comment that I made during Mr. Hokanson's argument, and I will mention that only, without intending expressio unius est exclusio alterius. I can't believe and don't believe that Chinn and O'Donnell are such scoundrels and so stupid as originally by deposition to have denied meeting Mr. Joseph the evening of November 18 when in fact they remembered the meeting. It would be ridiculous, in the light of the telegram, hotel registration, and other records of the event which they must have had in mind if they actually remembered the meeting. Moreover, if both of them were that foolish and dishonest, I can't imagine that their counsel would have been so during this period of about a month before the depositions, while they were, according to Mr. Clinton, rehearsing and drilling Mr. O'Donnell and Mr. Chinn for their testimony. I gather the impression that Mr. Clinton feels that Mr. O'Donnell at least went through quite an educational period prior to his deposition. I can't imagine that these counsel would be so inadequate to the situation as not to inquire whether they registered at a hotel or whether they sent any telegrams or whether they had signed any chits. Even if I thought Mr. O'Donnell and Mr. Chinn to be as untrustworthy as the plaintiff contends they are, I couldn't believe them to be so unwise as to deny what they must have known could easily and indisputably be proved.

"I am absolutely satisfied that Chinn and O'Donnell completely forgot ever having met Joseph the night before the meeting with Coleman on November 19th. If so, then I can't believe that at that genuinely forgotten or overlooked meeting O'Donnell consciously and expressly made a commitment for a 50-50 joint purchase of properties running into multiple millions of dollars in value. If they did so, the drink in progress at the time of the alleged commitment must have been extremely intoxicating. This is just one of the many circumstances in the evidence that has led me to the firm conclusion that there were no express words of mutual understanding and assent sufficient to amount to contract between Joseph and O'Donnell.

"I have no doubt that Mr. Joseph may have spoken hopefully of the matter. Surely, he wouldn't have come by the way of Portland on his way to California from Chicago if he didn't have hope something of profit might develop. It is quite likely that he did speak hopefully of the matter and perhaps expressed the hope or even suggestion that somehow or other, sometime or other, a deal might be worked out. However, let us keep in mind now, gentlemen, that here are two total strangers that at that time never have had any transactions before and neither one knows much about the other. Neither one of them knows much about the Kinzua properties or the basis of their possible purchase. Joseph didn't know much about it. All he knew was that

822

Terman said Kinzua was for sale. That is all. There is very little more that Joseph knew about it. To me, the evidence is most convincing that when he learned of the magnitude of the deal the next day from Coleman, Joseph was quite astounded and realized that any personal participation by him would be relatively small. I don't think that Mr. Joseph knew very much about Kinzua on the evening of November 18th and certainly O'Donnell knew very little about it at that time.

"It is difficult for me to believe that a man like O'Donnell who has lived as long as he has and been in business as long as he has and has stayed out of bankruptcy as long as he has, would buy a 'pig in the poke' within a matter of a few hours of meeting a man that he never had seen before excepting sometime long prior in St. Louis and then only across the room, a man as to whom he knows practically nothing; that he, O'Donnell, would immediately and readily over a casual drink agree to a 50-50 joint purchase in a transaction that was going to run into multiple millions of dollars. I don't believe it. That is not to say it might not have happened, but I don't believe it, and it happens to be my responsibility, at least in the first instance, to decide the fact.

"Now, let us go to the next point. Was there any course of conduct between these men that gave rise to the implication that they had a legally binding contract for a joint purchase of Kinzua? I have looked the evidence over from stem to stern and I can't find it. Of course, if you start with the assumption that they had an express agreement to that effect in the first place, then you can find support for the assumption in isolated parts of the conduct afterward; but if you don't start with that assumption, you can't find a contract in the course of conduct of the parties.

As a matter of fact, one of the remarkable things about the case is the infrequency of contact between Mr. Joseph and Mr. O'Donnell in a deal involving such magnitude as this. I haven't counted them up, but the contacts between them were very, very few; not many. I don't remember the exact number, but there were a few telephone calls and a couple of notes. I don't think there ever was so much as a full-length or formal letter, and none of Joseph's notes express any terms of an agreement between them, recite it, or even refer to it. I can't imagine that Mr. Joseph is so guileless that he would be involved in a deal of this magnitude with a man that he had very little acquaintance with, without at least dropping him a letter expressing pleasure at meeting him and confirming an agreement made, or in some way or other making some recital of the essence of it. I just don't think that Mr. Joseph who has lived as long as he has, and has been as successful as he has, would do business that way. Now, it may be that it was so and again I may be mistaken, but I don't believe it. The evidence is wholly insufficient to establish a contract arising by implication from the conduct of the parties.

In my judgment, gentlemen, for better or for worse, the words and actions of these parties, O'Donnell and Joseph taken together, in other words, the express words and the conduct, all of it taken together, amount to no more, at the very most, than an understanding that Kinzua would be investigated and the possibility explored of a deal in which each of them might participate in some manner and to some extent never specified. I think that is the most you can say about it. I think there was no agreement at all, except at most to investigate and explore possibilities. Certainly, none of the essential elements, let alone the important details of execution, of so important a venture contract were ever expressed and cannot reasonably be implied. Under the evidence which to me seems credible, the relationship between these parties at best is so vague, indefinite, and speculative, that as the trier of fact I cannot find assent and agreement on minimum elements amounting to a legally enforceable contract. I am not going to discuss the matter of consideration or any other particular negativing contract, because in my judgment the first essential element of the case, that is, agreement to make a joint purchase, is lacking.

"Among other things leading me to that conclusion is the conduct of Mr. Joseph from the latter part of March until the latter part of August. During that five-month period while he claims to have had the biggest deal of his life by far hanging fire, he never once telephoned, dropped a note, or made an inquiry of O'Donnell. His lack of interest in the matter during that five-month period is just astounding, if you accept his story that he had a legally enforceable contract with O'Donnell to share equally in a deal of that magnitude. I simply cannot believe and accept the story.

"The record here shows that Mr. Joseph is a man who frequently makes memoranda concerning business transactions. The exhibits are replete with memoranda of Mr. Joseph, notes and letters to Terman, the memos and various prospecti to his Chicago friends and what not. Yet not one word from Joseph to O'Donnell for five months. Now, I think that that is inconsistent with there ever having been any contractual obligation between Joseph and O'Donnell in the first place; and, secondly, I think that under those circumstances, considering all the factors in the situation, O'Donnell was certainly justified in believing that he had no duty to Joseph, and that the relationship, if any, between them, whatever it was, had been terminated.

"If you add to that five months' silence and inaction the next following circumstance, astonishment and incredulity increase. When Mr. Joseph saw the notice of the Kinzua sale in the 'Timberman', he wrote a nice letter to Mr. O'Donnell. Now I can understand the nice letter; apparently it was to try and get some kind of admission out of O'Donnell. That is somewhat out of keeping, however, with the contention of Mr. Joseph's being so completely naive and open about the whole thing. The only way I can account for his writing such a cordial letter is on the theory that it would induce O'Donnell into making some incriminating admission or statement about the deal, because, according to Joseph's testimony and according to notes purportedly written by Joseph at the time, he felt very bitter towards O'Donnell when he wrote that letter. He didn't put that feeling or any other of his present contentions in the letter.

"All right. The letter goes forward, and in September, I think it was September, he gets a response from O'Donnell. Now, that response in many respects is not very satisfactory. There is no question about it. But it certainly is clear in one thing, that O'Donnell didn't take any counsel from anyone before he wrote it. He just dashed it off, and there is no doubt that it wasn't all that it might have been from his point of view. It is another one of those things that I talked to you about at the beginning, the inadequacies, the defects of persons as witnesses sometimes speak more heavily as to their veracity than when everything they say fits together too well.

"In any case, the significant thing is that Mr. Joseph didn't make any response or assert any claim for 20 months after receiving O'Donnell's letter. That is, from September, 1953, until May, 1955, when the first demand on behalf of Joseph was made. I just can't believe that that is consistent with Joseph's present assertion that he had a clear and definite commitment for a binding contract of joint venture with O'Donnell. From the end of March to the end of August, 1953, five months, Joseph made no contact whatever with O'Donnell, then he writes this cordial letter and gets a response in 30 days, or whatever it was, and then another silence for 20 months after that. Either circumstance standing alone would throw the gravest doubt on Joseph's claim of joint venture; the two together make the claim incredible and untenable.

"In my judgment, whatever the relationship between Joseph and O'Donnell was—I am confident it was not joint venture or contract of any kind—but whatever it was, it was terminated at or about the end of March of 1953. I am confident that as of that time it was known and understood by the parties that Joseph's hope of participation in the Kinzua purchase was terminated, and that at the very least, under the circumstances O'Donnell had a right to believe that it was. I certainly cannot find it in my mind or conscience to believe the contrary from the evidence submitted to me. I must call the facts as I see them after carefully weighing the evidence, and that is the way I see them.

[18] "If we started with the finding that there had been a contract of joint venture between O'Donnell and Joseph giving rise to a fiduciary relationship between them, I would approach the whole thing on an entirely different basis. In such case, the onus would be upon the defendants, as has been pointed out in the cited authorities. On the question of whether or not there had been abandonment by Joseph or laches on his part, the burden would rest upon the defendants. Even in that situation I am inclined to think that the result might well be the same. I find and hold that the long failure of action by Joseph after August of 1953 under the conditions existing at the time, amounted to laches. During that 20-month period, when there were high hazards in the Kinzua purchase and in the lumber industry generally, Joseph made no request for a part of the deal. He let defendants put up the money and the effort and take the risks. Joseph waited to assert his claim until it seemed certain the purchase would prove profitable. He is now estopped

Irrespective of the fact there was *conflicting* evidence, we point out that in this Circuit (as in others) the rule is that the trier of fact is at liberty within bounds of reason to reject entirely the uncontradicted testimony of a witness which does not produce conviction in his mind of the witness' testimony.[12] This would be particularly true when the testimony comes from an interested party rather than a disinterested witness.[13] Or, the demeanor of the witness may be controlling rather than his actual words [14]—"the whole nexus of sense impressions" which one gets from a witness. Of course a judge may not reject uncontradicted evidence arbitrarily.[15] The reasons given by the trial judge in this case for his rejection of Joseph's testimony clearly demonstrate he did not act arbitrarily, but that his conclusion was based upon improbabilities and important discrepancies he found in Joseph's testimony.[16]

We fully agree with and follow the Supreme Court case cited and quoted by appellant, United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, that:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

This Court after a careful perusal of some 375 pages of Briefs and Appendices, most of the exhibits, and over 4,000 pages of transcript, is not left with the conviction, either definite or firm, or otherwise, that a mistake has been committed under the applicable Oregon and Washington law by the trial court in coming to the finding of fact which is decisive of this case—that no joint venture ever came into existence.

The judgment of the District Court is affirmed.

---

from asserting any claim he might otherwise have had.

"It is easy enough, speaking from hindsight, to talk about defendant's gain of 12 million dollars or 20 million dollars, or whatever was asserted in the argument, but it is quite apparent to me that during the long hazard period when Mr. Joseph might have shared a loss and lost his shirt, he was not anxious to press any claim for participation in the purchase. That is borne out to some extent by the changes in the condition of the lumber market as to which there is no dispute in the evidence. As a matter of fact, Joseph himself called the attention of O'Donnell to the unfavorable conditions in the lumber industry in the early part of 1953.

"Time is not available for further elaboration of my views. I think the motion to dismiss the action on the merits and with prejudice must be granted. It is so ordered."

12. Wong Gong Fay v. Brownell, 9 Cir., 1956, 238 F.2d 1; Mitsugi Nishikawa v. Dulles, 9 Cir., 1956, 235 F.2d 135, 140, reversed on other grounds, 1958, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659; Chow Sing v. Brownell, 9 Cir., 1954, 217 F.2d 140, 143 note 8; NLRB v. Howell Chevrolet Co., 9 Cir., 1953, 204 F.2d 79, 86, affirmed 346 U.S. 482, 74 S.Ct. 214, 98 L.Ed. 215. 7 Wigmore, Evidence § 2034 n. 3 (3d ed. 1940).

13. Quock Ting v. United States, 1891, 140 U.S. 417, 420, 11 S.Ct. 733, 35 L.Ed. 501; Yip Mie Jork v. Dulles, 9 Cir., 1956, 237 F.2d 383, 385; Lew Wah Fook v. Brownell, 9 Cir., 1955, 218 F.2d 924.

14. Nishikawa, supra, 235 F.2d at page 140; NLRB v. Howell Chevrolet Co., supra, 204 F.2d at page 86; Dyer v. MacDougall, 2 Cir., 1952, 201 F.2d 265, 269.

15. Yip Mie Jork v. Dulles, supra, 237 F.2d at page 385.

16. See notes 11 and 15 supra.