278 F.2d 427
 N. S. HOON, Appellant,
v.
HARMER STEEL PRODUCTS AND SUPPLY CO., a corporation, The Port of Longview, United Pacific Insurance Company, a corporation, Asano Bussan Company of New York, Inc., a corporation, and Robert T. Stevens, Appellees.
 No. 16297.
 United States Court of Appeals Ninth Circuit.
 March 24, 1960.
 Rehearing Denied May 3, 1960.
 
 Smith, Lindell, Krutch & Carr, Horton Smith, Rocky V. Lindell, Richard F. Krutch, Allen Lane Carr, Seattle, Wash., for appellant.
 McLean, Klingberg, Houston & Bergman, Judson T. Klingberg, Longview, Wash., for Harmer Steel Products.
 John F. McCarthy, Longview, Wash., for appellee Port of Longview.
 Bogle, Bogle & Gates, Thomas L. Morrow, Seattle, Wash., for appellee Asano Bussan Co. of New York, Inc.
 Barzee, Leedy & Lind, Robert A. Leedy, Portland, Or., for appellee Robert T. Stevens.
 Before HAMLEY, JERTBERG and KOELSCH, Circuit Judges.
 JERTBERG, Circuit Judge.
 
 
 1
 This is an appeal from the judgments by the district court in two of three cases which were consolidated for trial. Separate judgments were entered against the appellant in both cases, and separate appeals were taken which are presented on a consolidated record. The third case involved in the consolidated trial is not involved in this appeal.
 
 
 2
 These two actions in the district court involved claims and counterclaims for damages for conversion, breaches of contracts, for conspiracy, and for accountings.
 
 
 3
 Jurisdiction of the district court was invoked under Title 28 U.S.C.A. § 1332 (a). This Court has jurisdiction of this appeal under Title 28 U.S.C.A. § 1291.
 
 
 4
 The appellant is N. S. Hoon, a citizen of India, and is hereinafter referred to as Hoon or appellant. The appellees are Harmer Steel Products and Supply Co., a corporation organized and existing under the laws of the State of Oregon, hereinafter referred to as Harmer, the Port of Longview, a municipal corporation of the State of Washington, hereinafter referred to as the Port, United Pacific Insurance Company, a corporation organized and existing under the laws of the State of Washington, Asano Bussan Company of New York, Inc., a corporation organized and existing under the laws of the State of New York, hereinafter referred to as Asano, and Robert T. Stevens, a resident of the State of Washington, hereinafter referred to as Stevens. The appellee United Pacific Insurance Company took no active part in the trial and has filed no brief on this appeal.
 
 
 5
 The procedural events leading up to the consolidated trial in the district court are as follows: On February 13, 1957 Hoon commenced an action in the Superior Court of the State of Washington for Cowlitz County against Harmer and the Port, seeking specific performance, demanding possession of certain steel rails, and praying that their transfer be enjoined. The state court issued a temporary restraining order and directed the defendants to show cause why they should not be enjoined from disposing of the rails. Following a hearing, the state court issued an injunction, and United Pacific Insurance Company furnished the injunction bond on issuance of the temporary injunction. Asano intervened in such superior court action by filing a complaint in intervention. In the complaint in intervention United Pacific Insurance Company was added as a party because of the issuance of the injunction bond. Asano caused the state court action to be removed to the United States District Court, Western District of Washington, Southern Division. Following a hearing, the district court vacated all restraining orders and injunctions theretofore issued by the state court. Hoon filed an amended complaint in the district court against Stevens and his wife, Harmer, the Port, and Asano, seeking damages for conversion of the steel rails, damages for breach of contract, and conspiracy. Harmer counterclaimed against Hoon for damages in the amount of the attorneys' fees incurred by it in securing the vacation of the temporary injunction or restraining order issued by the state court. Stevens and his wife counterclaimed against Hoon for a judgment in the amount of the unapplied balance of a deposit made by Stevens to Hoon on account of a contract to purchase steel rails, and for damages arising out of the issuance of the temporary injunction or restraining order by the state court. Asano counterclaimed seeking damages against Hoon in the sum of $150,000.
 
 
 6
 On April 5, 1957 Stevens commenced an action against Hoon in the Multnomah County Circuit Court of the State of Oregon, seeking damages for breach of contract. Hoon caused said action to be removed to the United States District Court for the District of Oregon, which district court transferred said cause to the United States District Court for the Western District of Washington, Southern Division. Hoon counterclaimed, seeking damages against Stevens.
 
 
 7
 The district court ordered the two actions consolidated for trial on the ground that the actions involved common questions of fact and law, and that the interests of justice would thereby be better served. The trial of the consolidated causes, which followed pretrial hearings culminating in an extensive pretrial order, extended over a period of several days, during which the testimony of many witnesses was taken and in the course of which 200 exhibits were received in evidence. In its findings of fact in each cause the court stated:
 
 
 8
 "The court in general was favorably impressed with the credibility of Stevens and MacTarnahan, but not with that of Hoon. The court finds against Hoon on any issue of fact where the burden of proof is on Hoon and his position is supported only by his own testimony."
 
 
 9
 In its memorandum decision the trial judge stated in part as follows:
 
 
 10
 "The ultimate issues of importance in these cases present questions of fact. These issues are numerous, complicated and in some respects obscure by reason of the manner and course of dealings between the parties. Every detail in the facts has been considered whether or not specifically mentioned herein. Every exhibit has been studied critically, the evidence reviewed and the memoranda of counsel reread in the light of the argument and as related to the facts found by the Court. * * *
 
 
 11
 "While not satisfied with the veracity of MacTarnahan and Stevens in every particular of their testimony, in general I was favorably impressed with the integrity and credibility of both. In all important respects Stevens testified directly, reasonably and convincingly. I am satisfied that the apparent uncertainty and hesitancy in some parts of MacTarnahan's testimony was due to his habits of thought and speech rather than to any effort to avoid or alter the truth as he understood it.
 
 
 12
 "Hoon's ready and voluble explanation to his own advantage on almost every detail of the case did not impress me favorably, particularly when considered in contrast to his vituperative, self-serving letters filled with claims, contentions and immoderate charges against almost everyone with whom he dealt. His courtroom and witness stand personality bears only slight resemblance to that of the author of his writings. * * *
 
 
 13
 "On many points of dispute in the Hoon-Harmer and Hoon-Stevens accounting Hoon's contentions are supported only by his oral testimony. His glib explanations for the most part I find incredible; in some instances they are in direct variance with contract provisions and written evidence. I find against Hoon on any issue of fact where the burden of proof is on Hoon and his position is supported only by his own testimony."
 
 
 14
 We have set forth the views of the district court on his appraisal of the credibility of witnesses before him as expressed in the findings of fact and the memorandum decision in order to point up the limitations which are thereby placed upon our function as a reviewing court. These limitations are well expressed by this Court in the recent decision of Joseph v. Donover Co., Inc., 9 Cir., 1958, 261 F.2d 812. In that case this Court stated at page 817:
 
 
 15
 "Appellee O'Donnell was the prevailing party below, and hence we must take that view of the evidence most favorable to him. He is entitled to the benefit of all favorable inferences from the facts proved relative to the issue of his liability. If, when so viewed, there was substantial evidence to sustain the findings, then the judgment may not be reversed by this Court unless there is no evidence whatsoever to support the judgment; unless the clear weight of the evidence is against it; or, unless the trial court was influenced by an erroneous view of the law. Stacher v. United States, 9 Cir., 1958, 258 F.2d 112, 116; Lewis Food Co. v. Milwaukee Ins. Co., 9 Cir., 1958, 257 F.2d 525; John Hancock Mut. Ins. Co. v. Cohen, 9 Cir., 1958, 254 F.2d 417; Vidales v. Brownell, 9 Cir., 1954, 217 F.2d 136.
 
 
 16
 * * * * * *
 
 
 17
 "Irrespective of the fact there was conflicting evidence, we point out that in this Circuit (as in others) the rule is that the trier of fact is at liberty within bounds of reason to reject entirely the uncontradicted testimony of a witness which does not produce conviction in his mind of the witness' testimony. This would be particularly true when the testimony comes from an interested party rather than a disinterested witness. Or, the demeanor of the witness may be controlling rather than his actual words — `the whole nexus of sense impressions' which one gets from a witness. Of course a judge may not reject uncontradicted evidence arbitrarily. The reasons given by the trial judge in this case for his rejection of Joseph's testimony clearly demonstrate he did not act arbitrarily, but that his conclusion was based upon improbabilities and important discrepancies he found in Joseph's testimony.
 
 
 18
 "We fully agree with and follow the Supreme Court case cited and quoted by appellant, United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, that:
 
 
 19
 "`A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"
 
 
 20
 We will now proceed to review the questions of law and fact presented on this appeal guided by the salutary and well-established principles of law above set forth.
 
 
 21
 The setting of the controversies between the parties is against a background supplied by the fact that old railroad steel rails, originally used by the big timber companies of the Pacific Northwest for logging timber and no longer needed for such purpose, are in demand by nations across the Pacific Ocean, primarily India and Japan, for use as electric transmission poles.
 
 
 22
 Hoon had been active in the Pacific Northwest and British Columbia for about two years as a sole trader in used steel rails and steel scrap, although prior to that time he had engaged in that form of business for about ten years in India. Harmer was engaged in the purchase and sale of new and used steel materials. The Port operated storage and terminal facilities for the public at Longview, Washington. Stevens operated an import-export business at Portland, Oregon. Asano, having its principal office in the State of New York, was also engaged in the import-export business.
 
 
 23
 On or about September 26, 1956 Hoon and Harmer entered into an agreement under the terms of which Harmer was to act as Hoon's agent in the purchase of used steel rails and steel scrap, to be shipped by Hoon to India. Based upon sufficient evidence, the district court found that the agreement was partly oral and partly written; that Harmer was to receive a commission at the rate of $1.00 per ton on all purchases made pursuant thereto, and was entitled to be repaid out-of-pocket expenses, freight advances and other charges incurred for the account of Hoon.
 
 
 24
 Pursuant to the agreement Harmer contacted various possible sources of supply of the materials wanted by Hoon, including the Long-Bell Lumber Company and Crown Zellerbach. Shortly after September 26, 1956 Harmer effected the purchase of steel rails and other material from the Long-Bell Lumber Company. For that purpose Hoon agreed to keep a $10,000 deposit, after deduction of commissions, on hand with Harmer at all times to apply on the purchase of the last rails shipped. Again the trial court found, on sufficient evidence, that an accrual basis of computing this status of the account was contemplated by Hoon and Harmer, and on such basis Hoon failed to keep such deposit on hand and was in substantial debit balance with Harmer at various times, and at all times from January 7, 1957 to and including January 22, 1957. In connection with the Long-Bell transaction, and during the fall of 1956, Harmer became extremely dissatisfied with Hoon's failure to maintain the deposit and made frequent written and oral demands on Hoon for compliance with this requirement. In the fall of 1956 Harmer negotiated with Crown Zellerbach for the purchase of steel rails from it. Largely because of Harmer's dissatisfaction with Hoon's performance under the Long-Bell transaction, Harmer insisted that the Crown Zellerbach rails be handled on a different basis. Accordingly, on January 7, 1957 Hoon and Harmer entered into a written contract for rails from Crown Zellerbach at Cathlamet, Washington. Under this contract Harmer was designated as the seller and Hoon as the buyer. The contract recited that Harmer had contracted to purchase from Crown Zellerbach approximately 1500 tons of used rails and rail scrap, and that Hoon was desirous of buying the same. Harmer agreed to sell, and Hoon agreed to buy, said rails at a price of $55.50 per gross ton f.o.b. millsite at Cathlamet, Washington. Hoon agreed to deposit with Harmer the sum of $10,000, and to maintain such sum at all times during the life of the contract until final payment, at which time the deposit was to be applied against the last shipments. Hoon agreed to make payment to Harmer for the rails as shipped within two weeks from shipping date. The contract recited that Crown Zellerbach had agreed to load the material into trucks at its millsite. Finally the contract provided that in the event Hoon failed to comply strictly with the terms of the agreement Harmer at his option could declare the contract cancelled. In connection with the Crown Zellerbach rails it was understood by both Hoon and Harmer, as well as Crown Zellerbach, that the rails would be purchased by Harmer and that it would be solely responsible for payment to Crown Zellerbach. On January 7, 1957 transportation of the rails started from the millsite to the docks at the Port of Longview. The rails were sent under bills of lading designating Crown Zellerbach as consignor and Harmer as consignee. The transportation of the rails was performed by Hoon's trucking agent.
 
 
 25
 On January 8, 1957, Hoon as seller entered into a contract with Stevens as buyer, whereby Hoon agreed to sell to Stevens some 3500 tons of rails, including the Crown Zellerbach rails.
 
 
 26
 Deliveries by the truck of Hoon's hauling agent continued until on or about January 27, 1957. Harmer completed payment to Crown Zellerbach on or about January 31, 1957.
 
 
 27
 On January 21, 1957, after the close of business hours, Harmer notified Hoon by telegram, purporting to exercise its right to cancel the contract of January 7, 1957 because of the failure on Hoon's part to comply with the contract. On the following day Hoon personally talked to MacTarnahan, the president of Harmer, with whom Hoon had had all his dealings. MacTarnahan informed Hoon that the contract had been cancelled. The cancellation was based on the purported failure of Hoon to make payments for rails shipped and for failure to maintain the deposit as required by the terms of the agreement of January 7, 1957. Later in the day of January 22, 1957 Hoon tendered a check to Harmer in the amount of $25,000, which tender was refused. Hoon then notified the Port that he claimed an interest in the rails and material shipped from the Crown Zellerbach mill.
 
 
 28
 In the meanwhile Stevens, on the strength of his contract of January 8, 1957 with Hoon, had negotiated a sale to Asano of the Crown Zellerbach rails. Following the purported cancellation of the contract of January 7, 1957, Hoon began making demands on Stevens which were not contained in the January 8th agreement, and threatened to cancel that agreement unless Stevens complied with these demands.
 
 
 29
 On January 30 or 31, 1957, Stevens met MacTarnahan for the first time. They discussed their respective problems with Hoon. Harmer at that time was actively seeking a purchaser for the Crown Zellerbach rails. Stevens was hoping that Hoon would fulfill the contract to Stevens so his resale to Asano could be completed. At that time there was outstanding an option on the part of a New York dealer to purchase the rails from Harmer. Harmer agreed that if such should not be exercised, and in the event Hoon failed to supply Stevens with the agreed tonnage of rails, Harmer would sell them at the option price to Stevens.
 
 
 30
 Stevens on or about February 1, 1957 made demand upon Hoon for delivery of the rails pursuant to the contract of January 8, 1957. Hoon was unable to comply with the demand, and on February 4, 1957 Stevens purchased the Crown Zellerbach rails then in the custody of the Port. On this same day Harmer demanded from the Port a dock receipt, which was issued. This dock receipt was negotiated by Harmer to Stevens, and then on the same date negotiated by Stevens to Asano. It was at this point that Hoon filed his action in the state court to enjoin the delivery of the rails.
 
 
 31
 Following the consolidated trial, the district judge rejected Hoon's claims of breach of contract, conversion, and conspiracy, and entered judgment for Harmer for $1,500 on its first counterclaim [wrongful injunction], $8,936.90 on its claim for an accounting arising out of the transaction between Hoon and Harmer under the agency agreement of September 26, 1956. Judgment was also entered in favor of Asano in the amount of $3,500 on its claim of wrongful injunction, and in favor of Stevens in the amount of $10,491.45 damages for breach of contract.
 
 
 32
 We will first consider the controversy between Hoon and Harmer. In so doing we must keep in mind that under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., we are not at liberty to dislodge the findings of fact made by the district court unless they are clearly erroneous. Most of the findings on crucial issues of fact were adverse to the appellant. Many of the fact issues were resolved on the basis of the credibility of witnesses. We have carefully examined the entire record in this case. Keeping in mind the district court's appraisal of the credibility of the principal witnesses in these cases, we are unable to say that any of the findings of fact are clearly erroneous. They are binding on us. Joseph v. Donover Co., Inc. supra; Nelson v. New Hampshire Fire Insurance Co., 9 Cir., 1959, 263 F.2d 586. Our following discussion, therefore, in the main will relate to questions of law.
 
 
 33
 While it is true that Harmer under the agreement of September 26, 1956 was to act as a purchasing agent for Hoon, and while he did so on a number of occasions, the problem arises as to the effect of the agreement of January 7, 1957 on the agency relationship. At the outset it is to be noted that since the agency agreement specified no time duration for the relationship it was an agency at will which could be terminated by either party at any time on due notice to the other party. Wetherby v. Mark, 1917, 97 Wash. 463, 166 P. 1143; Seattle Times Co. v. Murphy, 1933, 172 Wash. 474, 20 P.2d 858. Whether the agreement of January 7, 1957 completely terminated the agency agreement is not an issue which we are required to determine. The district court found that on January 7, 1957 Hoon and Harmer entered into an executory written agreement which by its express terms provided for the purchase of the Crown Zellerbach rails by Hoon from Harmer, and that said contract provides as follows:
 
 
 34
 "3. Buyer agrees to deposit with seller the sum of Ten Thousand Dollars ($10,000.00) and to maintain said sum at all times during the life of this contract until the final payments at which time the sum of $10,000.00 previously deposited shall be applied against the last shipments.
 
 
 35
 "In the event buyer fails to comply strictly with the terms of this agreement, seller may at its option declare the contract cancelled."
 
 The court then found:
 
 36
 "The contract of January 7, 1957 either terminated the previous agency relationship between Hoon and Harmer, or at a minimum established the foregoing specific contract provisions concerning the agency relationship, the obligations of which both the parties were bound to observe and perform."
 
 
 37
 We find no overreaching by Harmer of Hoon in connection with the execution of this agreement, despite the fact that it was drafted by counsel for Harmer. Several modifications in the draft were suggested by Hoon and were agreed to by Harmer. Obviously Hoon read and understood the agreement. Otherwise no question as to the validity of such agreement has been raised. In substance, the court found that whatever the relationship may have been between Harmer and Hoon in respect to the Crown Zellerbach rails, such relationship was effectively cancelled and terminated at the close of the business day of January 21, 1957, because of the failure of Hoon to maintain the required deposit and to make payment for the rails shipped in accordance with the terms of the agreement of January 7, 1957. The district court found that under the contract Hoon was to make payments to Harmer for the Crown Zellerbach rails as shipped within two weeks from the shipping date; that the last date for payment on the first shipment of the rails was January 21, 1957; that no payments were made by Hoon between January 7, 1957 and January 21, 1957, purporting to be for such shipments; and that Hoon did not intend and was not prepared to make payments for shipments within two weeks of the date thereof or at all until after all shipments were completed. The court also found that an accrual basis in computing the status of the account was contemplated by Hoon and Harmer, and on this basis Hoon failed to keep such deposit on hand and was in substantial debit balance with Harmer at various times, and at all times from January 7, 1957 to and including January 22, 1957. We cannot say under the record in this case any of said findings are erroneous. It should be borne in mind that at the time of the execution of the January 7, 1957 agreement Harmer, as found by the court, was extremely dissatisfied with the manner in which Hoon had performed his obligations under the agency agreement of September 26th. It was for that reason that the contract of January 7th was entered into, including the provision granting to Harmer the option to cancel in the event Hoon failed to comply strictly with the terms thereof, a provision of which Hoon was well aware. Further, Hoon was advised by one of his own agents that Harmer would insist on strict performance of the contract. Time was therefore of the essence of the contract, as stated in the trial court's conclusions of law.
 
 
 38
 "Ordinarily, a contract must be performed within the time specified therein, and a party agreeing to perform within a specified time may perform at any time within such period without waiting for its expiration; but where performance is to begin at a specified time, such time cannot be accelerated by one party without the assent of the other. Where time is of the essence of the contract, a party who seeks damages for a breach must have complied with his own precedent covenants within the time required by the agreement."
 
 
 39
 C.J.S. Volume 17, Contracts, § 502, pages 1051-1052. See also § 504, C.J.S. Volume 17.
 
 
 40
 The district court found that on January 21, 1957 after the close of business hours Harmer sent telegraphic notice to Hoon, cancelling the January 7, 1957 agreement for Hoon's failure to make payments, as required; this notice was received by Hoon during the evening of January 21, 1957; and that on January 22, 1957 Hoon received unequivocal oral notice of cancellation on first contact with representative of Harmer. He made no tender until later that day after receipt of such oral notice. January 21, 1957 was Monday, and under Washington law the notice was not premature. Oriental Trading Co. v. Houser, 1915, 87 Wash. 184, 151 P. 242. Even if Hoon had until midnight of January 21st, Hoon received unequivocal oral notice of cancellation prior to his tender. On cancellation of this relationship between Hoon and Harmer with respect to the Crown Zellerbach rails the sum on deposit was not forfeited but was credited by Harmer to Hoon's account. In our view, under the record and the findings of the district court, whatever the relationship may have been between Hoon and Harmer in respect to the Crown Zellerbach rails, and whatever interest or title, if any, Hoon may have had to such rails, such relationship and such interest or title, if any, were effectively terminated prior to any tender made by Hoon. The trial court therefore properly concluded that "Hoon at no time after receipt of notice of cancellation from Harmer had title, right to possession, or any other interest of any nature in the Crown Zellerbach rails," and that "Harmer was the owner of the Crown Zellerbach rails and entitled to possession thereof on February 4, 1957." In view of the foregoing, it is clear that the district court did not err in denying Hoon's claim for damages for breach of contract, for conversion, and conspiracy.
 
 
 41
 We should also call attention to the findings of the trial court that "Hoon wilfully, intentionally and fraudulently interlined on his two copies of the January 7, 1957 contract in his possession the words `weeks on completion.' This attempted alteration was vital and material and was unknown to MacTarnahan or anyone acting for Harmer until some time after January 21, 1957. All other interlineations were agreed to by the parties and became a part of said contract." In this connection, the trial court in its memorandum decision stated:
 
 
 42
 "The unauthorized interlineation was wholly unknown to MacTarnahan or anyone acting for Harmer until after Hoon's January 21, 1957 notice of cancellation (Exhibit 31), but, as appears from Exhibits 35, 35-A and 53, in at least six written instances Hoon asserted that he was not obliged to pay for shipments under the contract until shipment in full was completed as he fraudulently attempted to provide by his unauthorized alteration. A finding that Hoon was wrongfully asserting and standing on such position prior to the cancellation notice is required by his testimony at trial claiming validity for the unauthorized interlineation. * * *" (Italics ours)
 
 
 43
 Further, the trial court concluded that "By his attempted alteration with fraudulent intent of a material provision of the January 7, 1957 contract relating to time of payment, Hoon is precluded from asserting a right of recovery for Harmer's cancellation of said contract," and "No equities exist in favor of Hoon to warrant the Court in relieving Hoon from his failure to perform the agreement of January 7, 1957." To justify such conclusions and the statements of the trial court we need only cite a brief portion of the testimony of Hoon on this point:
 
 
 44
 "The Court: I will bring it out, unless you prefer it being done each time. The figure he has just referred to, $55.50, is written in in ink in the second line of paragraph two of the Exhibit No. 29 for identification, and it bears that figure of $55.50 above the typed figure of $55.75, and then apparently the initials of certain persons whom I cannot exactly say who they are. I assume they are MacTarnahan and Hoon.
 
 
 45
 "Q. (By Mr. Elvidge): Whose initials are those? A. This is mine and this is MacTarnahan's (indicating).
 
 
 46
 "The Court: I assumed that, but I couldn't tell. All right. Go ahead.
 
 
 47
 "The Witness: Then, here the days have been cut. It has been cut and changed in my copy, `weeks' instead of `days.' It has been made to `two weeks on completion.'
 
 
 48
 "The Court: Now, the item that the witness has just referred to is found in the third line from the bottom of identification 29. At that point the word `days' is inked out and above it the words in ink are written in, `weeks on completion,' and here again are the initials of the persons previously referred to.
 
 
 49
 "The Witness: These are my copies. Both of them were given to me, and he retained the original. So the understanding that I got was two weeks on completion. `Two weeks on completion' I made, and he signed it and I signed it.
 
 
 50
 "The Court: In other words, he conformed the copies?
 
 
 51
 "The Witness: And I signed on his, and I told him to put `weeks on completion', which apparently he didn't do."
 
 
 52
 The conclusions and statements of the court also find support in law. Volume 2, Restatement of Contracts, page 815, Section 434; Leeper v. Lemon G. Neely Co., 6 Cir., 1923, 293 F. 967. See also Berg v. Poeppel, 1935, 181 Wash. 207, 42 P.2d 806, inferentially adopting the restatement rule.
 
 
 53
 In connection with the accounting between Hoon and Harmer on other transactions occurring under the agency agreement, we find only factual issues which were resolved by the trial court adverse to Hoon. The large item concerns a commission on a sale of used logging railroad parts to Georgia Pacific Timber Company. There was direct conflict in the testimony as to whether Hoon alone made the sale or whether Harmer acted as the successful broker. As above stated, such findings find support in the record and are not clearly erroneous, and are binding on us.
 
 
 54
 The trial court awarded Harmer damages caused by Hoon's wrongful injunction. The law is well settled that attorney's fees in dissolving a wrongful injunction are not allowed in a case initiated in a federal court, Tullock v. Mulvane, 1902, 184 U.S. 497, 22 S.Ct. 372, 46 L.Ed. 657, but are allowed in a suit commenced in a state court and removed to a federal court if the state from which the cause is removed allows such damages. Fidelity & Deposit Co. of Maryland v. L. Bucki Co., 1903, 189 U.S. 135, 138, 23 S.Ct. 582, 47 L.Ed. 744. The State of Washington allows such damages. White v. Brooke, 1895, 11 Wash. 99, 39 P. 237; Blakiston v. Osgood Panel & Veneer Co., 1933, 173 Wash. 435, 23 P.2d 397. It is clear that the cause of the issuance of the injunction was the unwarranted assertion on February 4, 1957 by Hoon of an interest in the Crown Zellerbach rails. The court did not err in this respect. The amount awarded, considerably less than that sought, finds support in the evidence.
 
 
 55
 We next turn to the controversy between appellant and the Port. We have heretofore held that the findings of the trial court that Harmer was the owner of the Crown Zellerbach rails and entitled to possession thereof on February 4, 1957, and that Hoon had no title, right or interest therein after the notice of cancellation, find support in the evidence and are not clearly erroneous. Under such circumstances, the trial court properly concluded that the Port was not liable either for conspiracy or conversion. Hoon argues that since the Port knew on February 4, 1957 that Hoon claimed an interest in the rails the Port should have instituted an interpleader action. Since the trial court properly held that Hoon had no interest of any kind in the rails on February 4, 1957, the Port certainly could not be held in damages for conspiracy or conversion.
 
 
 56
 The controversy between appellant and Stevens presents factual issues which the trial court resolved adverse to Hoon. The principal controversy revolves around Hoon's claim that under asserted parol modification of the January 8, 1957 contract Stevens became liable for some $13,000 charges in the loading of rails sold to him. The evidence was in conflict and the conflict was resolved against Hoon. The same reasons heretofore stated which caused the trial court to exonerate Harmer and the Port from the charges of conversion and conspiracy apply with equal force to Stevens. The judgment in his favor is fully justified by the record.
 
 
 57
 The final controversy concerns the award by the trial court to Asano for damages caused by the wrongful issuance of the injunction in the state court. It is clear that the award to Asano stands on the same footing as does the award made by the trial court for wrongful injunction in favor of Harmer. The trial court did not err in awarding damages to Asano.
 
 
 58
 The judgments entered by the district court are affirmed.